**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William MUELLER, Defendant–Appellant.**

**No. 95–3777.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1997.

Decided April 23, 1997.

Before MANION, KANNE, and EVANS, Circuit Judges.

MANION, Circuit Judge.

In this case of first impression in this circuit, the court must decide whether using a telephone to facilitate a drug offense, a violation of 21 U.S.C. § 843(b), constitutes a "controlled substance offense" under "career offender" Sentencing Guideline § 4B1.1. The application note to this guideline together with a statement by the United States Sentencing Commission, as well as other federal appellate decisions on this question, convince us that it does. Accordingly, we affirm the district court's sentence of marijuana grower William Mueller for a term in prison—84 months—which he is fortunate is not longer.

**I.**

*A. Factual Background*

In March 1994 a confidential informant told the Milwaukee Metropolitan Drug Unit that a couple who lived in suburban Milwaukee named "William and Victoria" were involved in the illegal drug trade. Authorities determined that their last name was Mueller. Surveillance of their home revealed a number of persons passing through their residence, as well as four bales stacked alongside the house marked "Canadian Grow Mix # 2"—a preferred soil for potting marijuana plants. William Mueller's telephone records showed a number of calls in February 1994 to a Peter Jackson in Watertown, Wisconsin. Mueller's and Jackson's properties were owned by a Howard Scherr. The officers went to the Watertown property and found a

farm with a stone farmhouse and a metal-framed "pole building." Early one morning the authorities took a thermal image of the pole building and found that it emitted a large amount of heat compared to other buildings on the property. An overpowering smell of marijuana also enveloped the officers. They could see an intense light inside the building, and an exhaust blower operating from one side of the building.

Suspecting drug manufacturing activity, the authorities obtained a search warrant for the pole building. They knocked on the door to the farmhouse, and Jackson opened the door. The officers asked if he owned the pole building. He said he did. The officers advised Jackson of his constitutional rights, and he agreed to speak with them. Jackson told the officers he purchased the farm from Scherr, that the pole building had been on the land when he purchased it, and that he rented it to a "Roy Wener" for $300 per month. Jackson said he had never been inside the pole building and that "Wener" told him he used it for storage. When the officers showed Jackson a picture of William Mueller, Jackson identified him as an old family friend about whom he "did not wish to say a lot."

While some officers talked to Jackson, others entered the pole building to execute the search warrant. Inside, they discovered an extensive, two-story marijuana-growing operation. The lower level contained a large number of mature plants, while the second floor contained an office area and nursery for young plants. The building also contained grow lights, grow mix, and other growing materials. The officers found 865 live marijuana plants and 576 pots containing root systems of previously-harvested marijuana plants.

When the officers told Jackson about the marijuana in the pole building, he first indicated he knew nothing about it. Jackson told the authorities Mueller was a "potter" who seemed to have a lot of money. Just then officers entered the house with a book of what appeared to be drug notes. When he saw this notebook, Jackson confessed. He stated that he had lied to the officers, that "Wener" was Mueller's alias, and that the marijuana growing in the pole building belonged to Mueller. Jackson indicated that Mueller had been growing marijuana on the farm when Jackson purchased it and often came to check on the plants. Jackson also stated that Mueller paid him $25 cash an hour to water and stake the plants, cut and harvest the buds, and to maintain the building. Rather than pay Jackson rent for the pole building, Mueller gave Jackson money to pay the farm's land contract. Mueller also had asked Jackson to make up a false lease in the name of "Roy Wener" to disguise Mueller's interest, and Mueller had accompanied Jackson to Scherr's office to refinance the land contract. Mueller had told Jackson that if the police discovered the marijuana, Jackson was to call Mueller as soon as possible. Jackson told the officers that the marijuana they found in the pole building that day was the year's third crop.[1]

Later that day, officers arrested Mueller. His wife gave the officers a number of documents belonging to her husband and told them he made his living growing marijuana and selling it. She indicated that while Scherr owned their house on paper, they actually owned it, and that she and her husband could not legally purchase a house because Mueller had no legitimate income. Mrs. Mueller pointed the officers to over $30,000 in stashed cash, and said that she and her husband had not reported income to the IRS for the past 5 years. She said Mueller had grown pot for the past 5 or 6 years, always on a farm. Mueller owned extensive property in Costa Rica, including a condominium, empty lots, and a share in a marina. Other records at the Mueller residence indicated they had been sending money to Costa Rica on a regular basis and corresponding with someone there about buying more properties. According to the U.S. Customs Service, Mueller had traveled at least twice recently to Costa Rica. Mrs.

---

1. A search of Jackson's farmhouse pursuant to written consent yielded three revolvers, two pistols, and ten rifles and shotguns. The officers also found a calendar containing notes on caring for the plants, photographs of the marijuana growth, magazines on organic growth, and a plant moisture meter. They also found marijuana and marijuana seeds.

Mueller also indicated that Scherr was her husband's largest marijuana customer; Scherr allegedly resold the marijuana Mueller provided to him.

## B. Procedural Background

Based on these events, a federal grand jury indicted Mueller and three other defendants. Mueller was charged with conspiring to manufacture and to possess with intent to manufacture in excess of 1,000 marijuana plants in violation of 18 U.S.C. § 2 and 21 U.S.C. § 846; possessing marijuana with intent to distribute in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1); and two counts of money laundering. The indictment also contained a provision seeking the forfeiture of nearly $140,000 in cash if the defendants were convicted.

When Mueller appeared before Judge Warren of the district court, he intended to plead guilty to the conspiracy charge against him. By the government's calculations, under the Guidelines in effect at that time, Mueller was responsible for 1,441 marijuana plants, which under § 2D1.1(a)(3)(4) yielded an offense level of 34. Mueller would also receive 2 points for leading the conspiracy pursuant to § 3B1.1(c). Even with the government's agreement that Mueller receive 3 points for acceptance of responsibility, his adjusted offense level would be 33, and his criminal history category V. Thus, he would have fallen within a sentencing range of 210 to 262 months, or 17 years 6 months to 20 years 10 months. Due to Mueller's cooperation, the government planned to move the district court for a downward departure for substantial assistance pursuant to USSG § 5K1.1.

But the probation officer assigned to this case pointed out a complication with the parties' calculations. Mueller had a prior drug conviction which on its face would not qualify as one of the convictions for career offender status under § 4B1.1. But Mueller had been released on probation after the conviction and violated that probation. The sentence for the probation violation occurred within 15 years of Mueller's sentencing in this case, subjecting him to the career offender enhancement under § 4B1.1. Accordingly,

Mueller's putative offense level rose to 36, and his criminal history category to VI, yielding a 30-year-to-life sentence (before any downward departure, of course). Because this sentencing range under the career offender provision was higher than the parties anticipated—and, according to the government, was "much too harsh" for a nonviolent marijuana grower—the parties sought and received postponements of the plea hearing twice to give them time to work out a new agreement.

On November 1, 1995, the U.S. Sentencing Commission was scheduled to amend the Guidelines. The previous version required that each marijuana plant be treated as one kilogram of marijuana. The amendment reduced that equivalency to 10% of its former level—each marijuana plant was now equal to 100 grams of marijuana. This substantially reduced the sentencing exposure of defendants convicted of possessing large numbers of marijuana plants. The government wished to give Mueller the benefit of these new amendments. Accordingly, on April 3, 1995 the government filed a superseding information charging Mueller with one count of money laundering and four counts of using a telephone to facilitate a drug-trafficking offense in violation of 18 U.S.C. § 843(b). Mueller waived his right to indictment in writing and pleaded guilty to all five counts of the superseding information. Both parties believed that Mueller's plea to the information would take him out of the "career offender" category because the "telephone offenses" would not count as "controlled substance offenses" under USSG § 4B1.1. The government again indicated at the plea hearing that at sentencing it would move for a downward departure based upon Mueller's cooperation.

Mueller was sentenced on November 14, 1995. Under the amended Guidelines, the parties expected Mueller's offense level to be 26; adding 2 for leading the conspiracy and subtracting 3 for acceptance of responsibility, the parties anticipated an adjusted offense level of 25, which with a criminal history category of V would yield a sentencing range of 100 to 125 months, or 8 years 4 months to 10 years 5 months. Because of Mueller's

cooperation in the charging of Scherr, pursuant to § 5K1.1 the government would move for a downward departure of 3 levels, leaving Mueller with an offense level of 22, and a sentencing range of 77 to 96 months, or 6 years 4 months to 8 years.

Mueller's attorney objected to the presentence report, however, which continued to recommend that Mueller be treated as a "career offender" under USSG § 4B1.1. The probation department had found that Mueller's convictions under 18 U.S.C. § 843(b) for the "use of a telephone" constituted "controlled substance offenses" for purposes of USSG § 4B1.2(2). Although this designation would not affect Mueller's offense level, his criminal history category automatically would rise to VI, increasing his sentencing range to 110 to 137 months, or 9 years 2 months to 11 years 5 months. The government joined in this objection to Mueller being designated a "career offender." Judge Warren agreed with the probation department, however, and calculated Mueller's sentence under § 4B1.1 using criminal history category VI. He granted the government's motion and departed downward 3 levels. This left Mueller at offense level 22 and in criminal history category VI, which yielded a sentencing range of 84 to 105 months, or 7 years to 8 years 9 months.

Judge Warren sentenced Mueller at the very bottom of the Guideline range to serve 84 months on the money laundering count, and 48 months on the "use of a telephone" counts, the prison terms to run concurrently. He also imposed supervised release of 3 years, and fined Mueller $2,000 and a $250 special assessment. Mueller filed a timely appeal, and challenges the legal conclusion that unlawful use of a communication facility in violation of 21 U.S.C. § 843(b) constitutes a "controlled substance offense" for purposes

of the career offender guideline. This court reviews this legal determination *de novo*, although it reviews for clear error factual findings used to determine the appropriate sentencing range. *United States v. Hayes*, 5 F.3d 292, 294 (7th Cir.1993).

## II.

At sentencing, the government and defense argued that use of a telephone in the commission of a drug offense, a violation of 21 U.S.C. § 843(b),[2] is not a "controlled substance offense" for purposes of calculating who is a "career offender" under Sentencing Guideline § 4B1.1.[3] The probation department asserted it was, and the district court agreed. On appeal the government now agrees that the unlawful use of a telephone offense should qualify as a "controlled substance offense," defined at USSG § 4B1.2(2) as "an offense under a federal or state law prohibiting the manufacture, import, export, distribution, or dispensing of a controlled substance ... or the possession of a controlled substance ... with intent to manufacture, import, export, distribute, or dispense."

First, a practical point about Mueller's appeal. The resolution of this central issue may not alter Mueller's sentence. Even if he had not been designated a "career offender" under § 4B1.1, there is no reason to believe he necessarily would have received a lighter sentence. Had Mueller not been designated a career offender, his criminal history category would have been V, rather than VI, and his offense level would remain at 22. Thus, rather than the 84- to 105-month range Mueller enjoyed after the district court granted the government's motion for a downward departure, his Guideline range, if we reverse the district court, would be 77 to 96 months. His sentence of 84 months still falls

---

2. This criminal statute makes it unlawful for "any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony.... Each separate use of a communication facility shall be a separate offense under this subsection...."

3. USSG § 4B1.1 states in pertinent part:
A defendant is a career offender if (1) the defendant was at least eighteen years old at the

time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or *a controlled substance offense,* and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense....*A career offender's criminal history category in every case shall be Category VI.* (emphases supplied).

in the bottom half of that range. If successful on appeal, Mueller's possible gain is 7 fewer months in prison, if on remand the district court decides to again sentence Mueller to the bottom of the Guideline range.

Of course Mueller has already gained significant ground since he originally faced from 30 years to life in prison for his crimes. The facts detailed above demonstrate that Mueller led a large drug conspiracy which produced a substantial amount of marijuana. Nearly 1,500 marijuana plants were found, and only quick work by authorities once they received the tip from the confidential informant squelched distribution of 60% of defendants' third crop of that season. Moreover, Mueller had been growing marijuana like this for 5 to 6 years, and the authorities found no less than 15 guns in Jackson's farmhouse. Mueller has benefitted greatly from the U.S. Attorney's discretion and a change in the Sentencing Guidelines. Given Mueller's psychological treatment and changed attitude, his young children, and his cooperation to help convict Scherr, the owner of Mueller's properties and a large beneficiary of the Watertown marijuana operation, the government filed a superseding information to which Mueller pleaded and received a substantially reduced sentence. Factor in the Guidelines amendment which calculates marijuana plants at 10% of their former weight, and Mueller received substantial windfalls which reduced his sentence from possible life imprisonment to only 7 years. Considering these events, Mueller should have little to complain of in this case.

Regardless of whether Mueller's punishment fit his crime, he is correct that every defendant is entitled to have the law correctly interpreted and applied in his case. He contends that unlawful use of a telephone to commit a drug offense is not a "controlled substance offense," and thus that his criminal history category should be V rather than VI. Mueller argues first from the "legislative history" of USSG § 4B1.2. The Sentencing Commission deleted from the guideline the specific list of statutory "controlled substance offenses" (which did not include § 843(b)) and eliminated language from the Application Note that this definition includes "substan-

tially similar" offenses. Mueller asserts that these changes demonstrate that the Commission did not intend for a § 843(b) violation to be considered a "controlled substance offense" for purposes of the career offender determination.

The problem with this argument, as with most made from the legislative history of a statute or other provision, is that it admits of more than one conclusion. *See United States v. Hudspeth,* 42 F.3d 1015, 1022 & n. 13 (7th Cir.1994) (citing Supreme Court opinions critical of legislative history analysis), *cert. denied,* —— U.S. ——, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995); *cf. United States v. Shriver,* 989 F.2d 898, 901 (7th Cir.1992) (legislative history only relevant to determine "whether it reflects 'a clearly expressed legislative intention to the contrary.' ") (quoting *United States v. Doherty,* 969 F.2d 425, 429 (7th Cir.1992)). We cannot know from the Sentencing Commission's deletion of the list of specific statutory offenses whether or not it meant to cast the net to include § 843(b) as an offense "substantially similar" to those listed "controlled substance offenses." The previous inclusion of the phrase "similar offenses" in the guideline arguably gave courts latitude to use as a predicate offense the use of a telephone to facilitate a drug trafficking offense. It arguably did not as well. The guideline's history is of little help.

Far stronger is for courts to look to the plain language of the sentencing guideline itself. *See, e.g., Newsom v. Friedman,* 76 F.3d 813, 816 (7th Cir.1996) (court's first obligation when construing meaning of law is to consider language itself before legislative history) (citing *inter alia Hudspeth*). USSG § 4B1.2(2) presents a two-part inquiry. First, the sentencing court must ask whether the statute prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance, or the possession with intent to do so. If so, it is clearly a "controlled substance offense." If not, the sentencing court asks whether the statute involves the "aiding and abetting, conspiring, [or] attempting to commit such an offense." If so, then the offense is a controlled substance offense.

The "unlawful use of a telephone offense" violation falls into the second part of the

inquiry: a defendant cannot be convicted of using a telephone to facilitate a drug offense unless the defendant also aids or abets, or attempts to commit, the drug offense itself. At the sentencing hearing, the probation officer pointed out that Application Note 1 to USSG § 4B1.2 states that "controlled substance offense" includes the offenses of aiding and abetting and attempting to commit an offense. Also, the Sentencing Commission has stated that use of a communication facility could be considered aiding and abetting a drug offense. Two other circuit courts have agreed with this reasoning. In *United States v. Vea–Gonzales*, 999 F.2d 1326 (9th Cir.1993), the defendant argued as Mueller does: a § 843(b) violation does not count as a predicate conviction for career offender status. *Id.* at 1328–29. The Ninth Circuit examined the plain language of § 843(b), and disagreed with Vea–Gonzales. It found that the statute's language places it within the Guidelines' definition of a controlled substance offense:

> As an element of the offense, the statute requires that in the course of using a communications facility the defendant must either commit an independent drug crime, or cause or facilitate such a crime. As part of a section 843(b) prosecution, the government may prove that the defendant actually "manufacture[d], import[ed], export[ed], or dispens[ed] ... a controlled substance." If proven, these acts would constitute an element of the communications facility offense. As such, the statute must be viewed as prohibiting those acts. Thus, because section 843(b) effectively prohibits the same conduct as is prohibited by "controlled substance offenses," the statute is a controlled substance offense for purposes of the career offender guideline.

*Id.,* 999 F.2d at 1329.[4] The Fourth Circuit considered the same argument in *United States v. Walton,* 56 F.3d 551, 555–56 (4th Cir.1995), and reached the same conclusion.

The reasoning employed by the courts in *Vea–Gonzales* and *Walton* is persuasive, and leads us to the outcome of this case. It follows from the statement in Application Note 1 to § 4B1.2 that "controlled substance offense" includes aiding and abetting and attempting to commit an offense, and the Sentencing Commission's statement that use of a communication facility could be considered as aiding and abetting a drug offense, that a § 843(b) offense qualifies as a controlled substance offense under the Guidelines' career offender provision. Mueller used a telephone to facilitate the manufacture and distribution of marijuana; this was established at the guilty plea hearing. By its plain terms, the underlying elements of 21 U.S.C. § 843(b) constitute a "controlled substance offense." Had Mueller not manufactured or distributed marijuana, he could not have used a telephone to facilitate those crimes. If Mueller would have been a career offender had he pleaded guilty to manufacturing marijuana, he should be a career offender if he pleaded guilty to using the telephone to facilitate the manufacture of that marijuana.

In support of his position, Mueller cites to *United States v. Baker,* 16 F.3d 854 (8th Cir.1994), and *United States v. Wagner,* 994 F.2d 1467, 1475 (10th Cir.1993). In *Baker,* the Eighth Circuit disagreed with the government that a violation of 21 U.S.C. § 856— managing or controlling a drug premises— always involved "aiding and abetting" the distribution of a controlled substance, and thus should qualify as a "controlled substance offense." 16 F.3d at 857. Relying on the jury's acquittal of Baker on a charge of conspiracy to distribute, the Eighth Circuit found the language of § 856 to be ambiguous: the statute is violated if a building owner knowingly makes his premises available for the purpose of manufacturing, storing, distributing, or *using* a controlled substance. *Id.* at 857. Because the court could not clarify the factual premise of the jury's

---

4. As we discussed in *United States v. Arango–Montoya,* 61 F.3d 1331 (7th Cir.1995), in *United States v. Burrows,* 36 F.3d 875, 885 (9th Cir. 1994), the Ninth Circuit now considers the Supreme Court's decision in *Custis v. United States,* 511 U.S. 485, 494–96, 114 S.Ct. 1732, 1738, 128 L.Ed.2d 517 (1994), to have overruled that portion of *Vea–Gonzales* which held that a defendant has a constitutional right collaterally to attack prior convictions used for sentence enhancement under § 4B1.1. 61 F.3d at 1337. The holding in *Vea–Gonzales* that a § 843(b) violation is a controlled substance offense for purposes of the career offender guideline was not affected, however.

conviction, and the government failed to charge Baker with aiding and abetting a distribution offense, it would not find that Baker's § 856 conviction constituted a controlled substance offense for purposes of § 4B1.2(2). *Id.* at 858. In *Wagner*, the defendant was convicted of violating 21 U.S.C. § 841(d) for possessing a chemical listed at 21 U.S.C. § 802(34), phenylactic acid, which is used to manufacture methamphetamine, a controlled substance. Phenylactic acid is not a controlled substance itself. The Tenth Circuit found that the defendant's offense under federal law—prohibited possession of a listed precursor chemical with the intent to manufacture a controlled substance—was not, by its plain terms, a federal law that prohibits manufacture or possession of a controlled substance. 994 F.2d at 1475. Thus, the court concluded that the defendant was not charged with the manufacture, or possession or attempt to manufacture a controlled substance, and the court would not redefine the charge.

These cases do not help Mueller. Rather than the tight fit between the offense language and the guideline requirement, as between 21 U.S.C. § 843(b) and § 4B1.2(2), they involve different criminal statutes without directly analogous language. Section 843(b) is different from the statute at issue in *Wagner*, § 841(d), which prohibits the possession of certain listed chemicals with the intent to manufacture a controlled substance. Under the Guidelines, § 841(d) has a calculation separate from possession or manufacturing offenses. The former has much lower offense levels than the latter. In contrast, the Guideline for violating § 843(b) states that the base offense level for using a telephone to facilitate a narcotics offense is "the offense level applicable to the underlying offense." A defendant sentenced for manufacturing or possessing marijuana with intent to distribute, and a defendant sentenced for using a telephone to facilitate such manufacture and possession with intent to distribute, would face the same Guideline calculation, and receive the same sentence.[5] That the Guidelines treat a § 843(b) violation in the same manner as a possession and manufacturing violation reinforces our conclusion that

the underlying elements of 21 U.S.C. § 843(b) constitute a "controlled substance offense."

### III.

We conclude, as have the other appellate courts to decide this issue, that a 21 U.S.C. § 843(b) violation qualifies as a "controlled substance offense" under USSG § 4B1.2(2) for purposes of determining "career offender" status under the Sentencing Guidelines. The district court considered the proper sources and correctly analyzed Mueller's case. Accordingly, Mueller's none-too-harsh sentence is

AFFIRMED.

---

**5.** The only difference between the convictions is that the statutory maximum is higher for manufacturing than for the telephone count: 20 years to life vs. 4 years.