# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 06-3606

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GEORGE CAMPBELL,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 751—**Joan B. Gottschall,** *Judge.*

————————

ARGUED FEBRUARY 12, 2008—DECIDED JULY 15, 2008

————————

Before EASTERBROOK, *Chief Judge,* and RIPPLE and
ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* George Campbell was charged
with one count of possessing with the intent to distribute
cocaine, in violation of 21 U.S.C. § 841(a)(1); and with
four counts of using a telephone in the commission of a
felony drug offense, in violation of 21 U.S.C. § 843(b). A
jury convicted Mr. Campbell of all five counts. The dis-
trict court sentenced him to concurrent prison terms of
48 and 120 months, followed by eight years of super-
vised release.

For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

In early 2004, Raul Montenegro, a known drug dealer, had several telephone conversations with Mr. Campbell about the possibility of Mr. Campbell's purchasing cocaine from him. On July 7, 2004, Montenegro called Mr. Campbell[1] and stated: "Uh, my friend call me. Probably they they're gonna meet tomorrow for, the, the remember I told you? Probably the one, they want tickets for the, the Big Game." Appellee's App. at 2. Mr. Campbell responded, "Yeah, one ticket or two tickets?" Montenegro said, "Probably one," and explained, "He wanna, he wanna make sure how it, how it is, okay?" *Id.* Mr. Campbell responded, "Gotcha," and Montenegro told him that he would call him the next day. *Id.*

On July 8, 2004, after having numerous conversations with Miguel Diaz, his drug supplier, Montenegro called Mr. Campbell and said, "Yeah. Uh, according to everything, I'm going to pick up my lady. You know, my girlfriend, take it with me." *Id.* at 28. Montenegro and

---

[1] The Government obtained court authorization to intercept many of the telephone conversations between Mr. Campbell and Montenegro and between Montenegro and Miguel Diaz, Montenegro's drug supplier. These conversations were recorded, and both the recordings and transcripts of the calls were admitted into evidence.

Mr. Campbell then made arrangements to meet at Mr. Campbell's residence. In the interim, Montenegro met with Diaz and picked up one kilogram of cocaine. Later that night, Montenegro called Mr. Campbell and told him that he was about to arrive at Mr. Campbell's residence. Mr. Campbell told Montenegro that he would be home shortly and that he would tell someone at his residence to let Montenegro in.

At trial, Montenegro testified that he entered Mr. Campbell's residence with the one kilogram of cocaine. According to Montenegro, when Mr. Campbell arrived at the residence he explained that there was an unfamiliar car in a nearby parking lot. He asked Montenegro if Montenegro had arrived at the residence alone. Montenegro assured Mr. Campbell that he had done so. Mr. Campbell pointed to the unfamiliar car from the window of the residence, but Montenegro could not identify the vehicle. Still unsatisfied, Mr. Campbell made Montenegro accompany him outside in an effort to have Montenegro identify the unfamiliar vehicle. Montenegro nevertheless could not identify the car.

Prior to leaving Mr. Campbell's residence to inspect the car, Montenegro left the kilogram of cocaine in Mr. Campbell's house, either on a table or on his couch. At trial, Montenegro testified:

> AUSA: At some point while you were in the apartment with George Campbell, did you give him the kilogram of cocaine?
>
> MONTENEGRO: Well, actually I left I think on the table or in the couch, something like that. I don't remember where.

I put it there because we went out-
side. I wasn't—I wasn't—not carry-
ing that thing with me outside the
house because we were thinking
like maybe there was police or
something else, so—or rob or
something. So I left it there.

* * *

AUSA:                [W]as George Campbell there at
                     the table when you took the co-
                     caine out?

MONTENEGRO:          When I took it? No, I didn't took
                     it, actually. But he was there but he
                     was—actually we were talking
                     about who was in that car, you
                     know, who could that be. So we
                     didn't pay attention to the—just
                     got out, tried to identify the car.

AUSA:                So at any point did you give
                     George Campbell the cocaine while
                     you were in the house?

MONTENEGRO:          You mean hand him?

AUSA:                Yes.

MONTENEGRO:          No.

AUSA:                Did you give it to him?

MONTENEGRO:          No, we just put it there. I mean,
                     I put it there, actually. He was not
                     worried about who was in. . . .

R.219 at 142-43.

The Government then impeached Montenegro with statements that he had made at his change of plea hearing:

AUSA: [During the change of plea hearing], the Court asked you . . . "then you actually went inside of Mr. Campbell's residence and delivered the kilo of cocaine to Mr. Campbell? And then the two of you left Mr. Campbell's residence? Is that what happened?" And you answered, "yes"?

MONTENEGRO: Yes, correct.

AUSA: But your testimony today is, you didn't give the kilogram—

*Id.* at 145. Mr. Campbell's counsel objected on the ground that Montenegro's testimony from the change of plea hearing did not contradict his trial testimony. The district court overruled the objection, and the testimony continued:

AUSA: When you pled guilty to these charges and you took an oath before this Judge, you told her under oath that you went inside of Mr. Campbell's residence, and you delivered the kilo of cocaine to Mr. Campbell.

MONTENEGRO: Yes.

AUSA: And you said yes.

MONTENEGRO: Yes.

*Id.* at 145-46.

After Montenegro and Mr. Campbell went outside to look at the car, Mr. Campbell left the area. Drug Enforcement Administration ("DEA") Special Agent Ryan Rapaszky, who had conducted surveillance at Mr. Campbell's residence throughout the day, confirmed that Montenegro and Mr. Campbell looked closely at the two DEA surveillance vehicles parked in the nearby lot, that Mr. Campbell got into his car for approximately ten minutes and that Mr. Campbell then left the parking lot at approximately 10:40 p.m.

At 10:45 p.m., Mr. Campbell called Montenegro, explaining: "Yea, I'm being followed right now. So I don't know what the hell is going on here man. . . . So you might as well leave." Appellee's App. at 46. Montenegro responded, "Should I leave?" and Mr. Campbell responded, "you might . . . Yeah, you better. I just said I'm being followed." *Id.* Mr. Campbell did not instruct Montenegro to take the cocaine with him, and Montenegro testified that he left the cocaine on Mr. Campbell's table.

Later that same night and the following day, July 9, 2004, Montenegro and Diaz exchanged several calls. In these phone calls, Diaz, using coded language, inquired about the cocaine. Montenegro could not give Diaz an update because he had not yet spoken to Mr. Campbell. Montenegro had several short telephone conversations with Mr. Campbell, but Mr. Campbell did not give Montenegro an update about the status of the deal. At one point, Montenegro left Mr. Campbell a message: "You there? Call me every five minutes. They want a simple question, you still give me a simple answer. Yes, or not. That's all I want to know. Okay, bye." *Id.* at 62.

At 1:43 p.m., Mr. Campbell called off the drug deal. Mr. Campbell spoke to Montenegro and stated, "Just, I'm

saying no, period." *Id.* at 66. Montenegro then explained, "Alright, I have to pick it up now. Okay?" *Id.* Mr. Campbell responded, "Alright, I'm gonna hit you back in half an hour," to which Montenegro replied, "Okay." *Id.*

On the following day, DEA Task Force Officer George Wodka conducted surveillance at Mr. Campbell's residence, and he discovered in a dumpster near Mr. Campbell's residence a cereal box wrapped in a clear plastic bag. The dumpster was approximately 50 feet from the residence, and there was a clear, unobstructed view of the area from the second floor windows of Mr. Campbell's residence. Officer Wodka testified that there was a brick-shaped object wrapped in duct tape—approximately 978.5 grams of cocaine—inside the cereal box.

The jury also heard the testimony of Task Force Officer Robert Coleman. Officer Coleman testified as to his extensive experience in investigating narcotics offenses, including his knowledge of the use of coded language by narcotics organizations, the means by which narcotics are bought and sold, the wholesale and retail pricing of powder cocaine and the quantities of cocaine that are considered distribution quantities.[2] Officer Coleman explained to the jury that when narcotics are "fronted" to a customer, it means that the narcotics are provided on credit and are paid for after the customer resells the narcotics. The wholesale price of a kilogram of cocaine in the Chicago area, explained Officer Coleman, was between $17,000 and $25,000. Officer Coleman also testified that one kilogram of cocaine was a distribution quantity.

---

[2] Officer Coleman was qualified as an expert without any objection from Mr. Campbell.

Officer Coleman further explained to the jury that Montenegro's use of the term "tickets" in conversation with Mr. Campbell meant "kilograms" and that when Mr. Campbell asked Montenegro "one ticket or two," he was asking whether Montenegro had one or two kilograms. R.219 at 86. With regard to another conversation between Mr. Campbell and Montenegro, Officer Coleman opined that Montenegro's use of the phrase "I'm going to pick up my lady . . . [y]ou know my girlfriend" meant that Montenegro was going to go pick up the cocaine, and that Montenegro's reference to picking up the "tickets" meant that he wanted to pick up money from Mr. Campbell. *Id.* at 92.

**B.**

At the close of the Government's case, Mr. Campbell moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court reserved the motion. A jury convicted Mr. Campbell of all five counts asserted in the superseding indictment: namely, one count of possessing with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and four counts of using and causing to be used a telephone in the commission of a felony drug offense, in violation of 21 U.S.C. § 843(b).

Mr. Campbell filed his renewed motion for judgment of acquittal and a motion for a new trial. R.105, 106. In support of these motions, Mr. Campbell challenged the sufficiency of the Government's evidence with respect to his possession and intent to distribute the cocaine. Essentially, Mr. Campbell asserted that he did not have the intent to distribute at the time that he possessed the cocaine. The district court denied the motions. It held that

the Government had introduced sufficient evidence to allow a reasonable jury to find that Mr. Campbell possessed and intended to distribute the cocaine that Montenegro had left at his residence. R.136.

After the district court's denial of these post-trial motions, Mr. Campbell's counsel, with the district court's leave, withdrew. Mr. Campbell obtained new counsel, who remains his counsel on appeal. Mr. Campbell's new counsel made an oral motion for permission to file a motion for reconsideration; the district court granted the motion, although it expressed skepticism about its ability to consider new issues raised by Mr. Campbell's new counsel.

Counsel then filed a motion for reconsideration, which the district court denied. The court ruled that, although the motion for reconsideration challenged the sufficiency of the Government's evidence, it did so on grounds different from those presented in Mr. Campbell's original motions. Specifically, the district court noted that Mr. Campbell's original motions had not challenged the sufficiency of the evidence with respect to Montenegro's delivery of cocaine to Mr. Campbell or Mr. Campbell's constructive possession of the cocaine. R.162 at 2. The court accordingly determined that these new arguments were untimely, and it denied reconsideration of arguments that the court had addressed in its denial of Mr. Campbell's previous post-trial motions. *Id.*

The district court sentenced Mr. Campbell to concurrent sentences of 120 months' imprisonment for the violation of 21 U.S.C. § 841(a)(1) and 48 months' imprisonment for the violation of 21 U.S.C. § 843(b).

## II

## DISCUSSION

### A.

Mr. Campbell challenges the sufficiency of the Government's evidence *solely* with respect to whether he possessed the cocaine that Montenegro left at his residence.[3] A

---

[3] Mr. Campbell was charged with possession with intent to distribute, 21 U.S.C. § 841(a)(1), and, therefore, in addition to proving that he possessed the cocaine, the Government was required to prove that Mr. Campbell intended to distribute it. *See United States v. Orozco-Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006). There is an argument that the Government's proof with respect to intent was lacking because it (arguably) did not establish that Mr. Campbell intended to distribute the cocaine *at the same time* that he possessed it. Mr. Campbell, however, does not make the argument before us. Mr. Campbell's briefs contend solely that the Government's proof with respect to possession or constructive possession (that is, whether he intended to exercise dominion or control over the contraband). There is one, lone sentence in Mr. Campbell's main brief that asserts: "The evidence was insufficient to prove defendant possessed about one kilogram of cocaine with intent to distribute." Appellant's Br. at 11. The sentences that follow, however, make clear that Mr. Campbell is challenging just the possession aspect of the offense, rather than the intent to distribute element. *Id.* at 12. Mr. Campbell's reply brief also does not provide any argumentation as to the intent to distribute element.

At oral argument, counsel's presentation focused solely on the possession element of the Government's case. Indeed, one of the judges on the panel commented that Mr. Campbell *should* be arguing that the Government's evidence was legally

(continued...)

---

[3]  (...continued)
insufficient to prove that he intended to distribute the cocaine. In response, counsel stated that he believed that the argument regarding intent to distribute had not been preserved by Mr. Campbell's previous counsel. In other words, counsel believed that Mr. Campbell's previous counsel had forfeited this argument.

Our review of the record indicates that counsel's recollection was not accurate. Mr. Campbell's former counsel in fact challenged the sufficiency of the evidence as to possession and intent to distribute as well as the argument that possession and intent were not simultaneous. R.105 at 2-4 (memorandum in support of Mr. Campbell's motion for judgment of acquittal); R.112 at 2-5 (reply memorandum). These issues, therefore, were preserved for appellate review. Moreover, the district court clearly treated former counsel's submissions as raising the issue of whether Mr. Campbell possessed the drugs at the same time that he had the intent to distribute them. R.136 at 2-4.

After reviewing Mr. Campbell's submissions in this court, however, we must conclude that he has not raised any argument on appeal regarding the sufficiency of the Government's evidence as to intent to distribute, and therefore that issue is not before us. *United States v. Feinberg*, 89 F.3d 333, 340-41 (7th Cir. 1996); *see also Lear v. Cowan*, 220 F.3d 825, 828-29 (7th Cir. 2000) (noting that issues raised for the first time by the judges at oral argument are "waived").

In any event, the Government introduced sufficient evidence for a reasonable jury to conclude that Mr. Campbell intended to distribute the cocaine and that his intent to distribute coincided with his possession of the narcotics. The Government's evidence established that Mr. Campbell, after discussing the details with Montenegro, agreed to participate in a drug fronting scheme; the cocaine would be provided on credit to Mr. Campbell, after

(continued...)

defendant making an insufficiency of the evidence argument faces a difficult task. *See United States v. Pulido*, 69 F.3d 192, 205 (7th Cir. 1995) (characterizing the burden as a "nearly insurmountable hurdle"). In reviewing a challenge to the sufficiency of the evidence, we do not weigh the evidence, *United States v. Bowman*, 353 F.3d 546, 552 (7th Cir. 2003), make credibility determinations, *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999), or resolve testimonial inconsistencies, *see United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003). Taking the evidence in the light most favorable to the Government, we "will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2003) (internal quotation marks and citations omitted).

### B.

The three elements required for a conviction under 21 U.S.C. § 841(a)(1) are: (1) knowing or intentional possession

---

[3] (...continued)

which Mr. Campbell would pay for the cocaine once he resold it. Mr. Campbell directed Montenegro to deliver a distribution quantity of cocaine to his residence, and he made arrangements for someone to admit Montenegro if he arrived at the residence before Mr. Campbell. Montenegro delivered the cocaine to Mr. Campbell, and the cocaine remained in Mr. Campbell's control until the following day. Regardless of whether Mr. Campbell subsequently decided to return the cocaine, the Government's evidence was sufficient to establish that, when Montenegro made the delivery to his residence, Mr. Campbell simultaneously possessed and intended to distribute the cocaine.

of cocaine; (2) possession of cocaine with intent to distribute it; and (3) knowledge that the material is a controlled substance. *United States v. Banks*, 405 F.3d 559, 569 (7th Cir. 2005). A defendant violates 21 U.S.C. § 843(b) if he "knowingly and intentionally use[s] a communications facility, *e.g.*, a telephone, to facilitate the commission of a narcotics offense." *United States v. Alvarez*, 860 F.2d 801, 813 (7th Cir. 1988) (internal quotation marks and citation omitted). Proof of an underlying narcotics offense is an element of a section 843(b) conviction. *Id.*; *see also United States v. Mueller*, 112 F.3d 277, 281-82 (7th Cir. 1997) ("[A] defendant cannot be convicted of using a telephone to facilitate a drug offense unless the defendant also aids or abets, or attempts to commit, the drug offense itself."). Therefore, the validity of Mr. Campbell's conviction on these counts depends on the sufficiency of the Government's evidence with respect to the section 841(a)(1) offense. As to that offense, Mr. Campbell challenges the sufficiency of the Government's evidence only with respect to whether he knowingly or intentionally possessed cocaine, and therefore we shall confine our discussion to that element of the Government's case.

The Government may satisfy this element by proving either actual possession or constructive possession. *United States v. Starks*, 309 F.3d 1017, 1022 (7th Cir. 2002). Constructive possession may be proven using either direct or circumstantial evidence. *See United States v. Parra*, 402 F.3d 752, 761 (7th Cir. 2005). It requires proof that the defendant had the "power and intent to exercise control" over the illegal drugs. *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008) (internal quotation marks and citations omitted). A defendant may exercise "ownership, dominion, authority, or control" over the drugs himself

or through intermediaries. *Starks*, 309 F.3d at 1022; *see also Moses*, 513 F.3d at 733. Accordingly, "an accused . . . has control of narcotics when he has the authority—not legal authority, but the recognized authority in his criminal milieu—to possess and determine the disposition of them." *United States v. Windom*, 19 F.3d 1190, 1200 (7th Cir. 1994) (internal quotation marks and citation omitted). In previous cases, for example, we have framed our inquiry by asking whether the defendant "likely had some appreciable ability to guide the destiny of the drug." *United States v. Manzella*, 791 F.2d 1263, 1267 (7th Cir. 1986) (internal quotation marks and citation omitted).

This court, nevertheless, has exercised vigilance in ensuring that the doctrine of constructive possession does not ensnare innocent bystanders, especially when possession is not exclusive. *United States v. Harris*, 325 F.3d 865, 869 (7th Cir. 2003). To guard against this risk, the Government must "establish a nexus between the accused and the contraband." *Parra*, 402 F.3d at 762. "Mere proximity to the drug, mere presence on the property where it is located, or mere association, without more, with the person who does control the drug or property on which it is found, is insufficient to support a finding of possession." *United States v. DiNovo*, 523 F.2d 197, 201 (7th Cir. 1975) (internal quotation marks and citation omitted).

To convince us that the Government's evidence of possession is legally insufficient to support the jury's verdict, Mr. Campbell asserts that, because Montenegro's testimony established that Mr. Campbell had a deep suspicion that the police were surveilling his residence, "it is logical to conclude that [Mr. Campbell] at the time" had no intention to exercise dominion or control over the cocaine. Reply Br. at 5. Mr. Campbell also focuses on

the absence of evidence indicating that Montenegro physically delivered the cocaine to him and on the absence of fingerprints on the packaging of the cocaine that was found in the dumpster.

We believe that the Government introduced sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Mr. Campbell possessed the cocaine. The jury listened to, and read transcripts of, the numerous recorded phone calls between Mr. Campbell and Montenegro and between Montenegro and Diaz, Montenegro's drug supplier. The Government introduced the testimony of Officer Robert Coleman, who testified that, in those calls, Mr. Campbell, Montenegro and Diaz were using coded language to negotiate a drug deal—or, more specifically, a drug fronting scheme. In a fronting scheme, Officer Coleman explained to the jury, narcotics are provided on credit to a customer, who then pays for the narcotics once he resells them.

On July 7, 2004, for example, Montenegro called Mr. Campbell and told him that his friend had "one ticket" to the "Big Game," meaning one kilogram of cocaine. R.219 at 86. The next day, Montenegro called Mr. Campbell to tell him that he was going to pick up his "lady," "you know, my girlfriend, take it with me," again referring to the cocaine. R.219 at 92. Shortly thereafter, Montenegro called Mr. Campbell to inform him that he had picked up his "wife," that he was "close to" Mr. Campbell's residence, R.219 at 93, and that he had to "pick up the kid, the tickets for Saturday's games," meaning that he wanted to

pick up money from Mr. Campbell.[4] In a subsequent call, Mr. Campbell told Montenegro to call him when he arrived at Mr. Campbell's residence, and Mr. Campbell explained that he would have someone let Montenegro inside.

The jury also heard the testimony of Montenegro. Montenegro admitted that, while in Mr. Campbell's presence, he had left the cocaine on Mr. Campbell's table or on his couch.[5] He also testified about Mr. Campbell's behavior regarding the presence of an unfamiliar vehicle parked nearby. Mr. Campbell repeatedly asked Montenegro whether he had been followed. Indeed, Mr. Campbell went outside with Montenegro in an effort to determine whether Montenegro could recognize the

---

[4] Counsel for the Government asked Officer Coleman: "[I]s there anything about that particular conversation or that particular context that causes you to have the opinion that tickets means money here as opposed to kilograms of cocaine?" R.219 at 93. Officer Coleman responded: "Well, the context of the conversation, he's referring to 'I got my wife with me,['] meaning he's got a kilo with him, and [']is going to pick up the kid, the tickets for Saturday's game,' meaning money." *Id.*

[5] Mr. Campbell points out that Montenegro testified that he did not physically hand the drugs over to Mr. Campbell. Montenegro's testimony, along with the telephonic negotiations about the drug delivery, are fatal to such an assertion. The Government, moreover, introduced Montenegro's prior statement that he had delivered the cocaine to Mr. Campbell when he arrived at Mr. Campbell's residence. Mr. Campbell objected to the introduction of this latter testimony on the ground that it was not impeaching of Montenegro's testimony, but the district court overruled the objection; Mr. Campbell does not challenge this evidentiary ruling on appeal.

vehicle. After Montenegro stated that he could not identify the vehicle, Mr. Campbell went inside his car, called Montenegro and told him to leave because he believed that they were being followed. Despite knowing that Montenegro, at his direction, had just brought a kilogram of cocaine to his residence, at no point did Mr. Campbell tell Montenegro to take the cocaine with him; rather, Mr. Campbell permitted the cocaine to remain on the premises for some period of time. The following day, Officer Wodka found approximately one kilogram of cocaine wrapped inside a cereal box in a nearby dumpster. Officer Wodka explained to the jury that the dumpster could be seen without obstruction from the second floor windows of Mr. Campbell's residence.

Given the evidence of Mr. Campbell's prior negotiations with Montenegro, the jury was entitled to find that Mr. Campbell was orchestrating the purchase of a kilogram of cocaine from Montenegro and that Mr. Campbell had directed Montenegro to deliver the cocaine to his residence once Montenegro obtained the cocaine from Diaz. Additionally, the jury reasonably could have concluded that Mr. Campbell intentionally possessed the cocaine after Montenegro, at Mr. Campbell's instruction, left Mr. Campbell's residence without any instructions to take the cocaine with him. *See Windom*, 19 F.3d at 1200. The numerous phone calls between Montenegro and Mr. Campbell regarding the fronting scheme and Mr. Campbell's apprehension about the unidentified vehicle parked nearby dispel the notion that Mr. Campbell was a mere innocent bystander who was uninvolved in Montenegro's drug dealings. *See Harris*, 325 F.3d at 869.

Mr. Campbell claims that "it is logical to conclude" that, because Mr. Campbell had suspicions that the police

were surveilling his residence, he had no intention to exercise dominion or control over the cocaine. Reply Br. at 5. That conclusion, however, is not the only logical one; it is one that the jury was entitled to reject. *See Harris*, 325 F.3d at 865 (discussing arguments that ask "the trier of fact to ascribe a particular significance to the adjudicative facts of record" but "do not require that the trier of fact accept such an explanation"). Consequently, we hold that the jury was entitled to find that Montenegro and Diaz had "fronted" the kilogram of cocaine to Mr. Campbell and that, after Montenegro delivered the cocaine to his residence, Mr. Campbell had taken possession of the illegal drugs.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED