In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 07-2522

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MUHAMMAD KHATTAB,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 497—**Matthew F. Kennelly**, *Judge.*

———————

ARGUED JUNE 5, 2008—DECIDED AUGUST 5, 2008

———————

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

KANNE, *Circuit Judge*. Muhammad Khattab was convicted after a bench trial on one count of attempting to possess or distribute pseudoephedrine with knowledge, or a reasonable cause to believe, that it would be used to manufacture methamphetamine. *See* 21 U.S.C. § 846; *see also id.* § 841(c)(2). Khattab claims that the evidence presented at trial was insufficient to sustain his conviction. We disagree, and affirm.

## I. History

In early 2005, Muhammad Khattab began negotiating with Khalid Hassan for the purchase of a large quantity of pseudoephedrine. Unbeknownst to Khattab, Hassan was a confidential informant for the Drug Enforcement Agency (DEA), and recorded his telephone conversations with Khattab. On April 22, 2005, Khattab met in person with Hassan and another man at an auto-parts store. Hassan wore a recording device, which picked up a conversation in Arabic between the three men about the prospective sale. Khattab communicated with Hassan on several other occasions, all of which were monitored and recorded by the government. Over the course of these conversations, Hassan told Khattab that he had a contact who could sell Khattab 100 boxes of pseudoephedrine.

On May 31, 2005, Khattab and Hassan scheduled a meeting with DEA Agent James Jones, who posed as a deliveryman for Hassan's fictitious pseudoephedrine supplier. Khattab and Hassan drove to the site where they were supposed to meet Jones, but Khattab became nervous because of the potential presence of law enforcement officers in the area, and cancelled the meeting. Khattab and Hassan then drove around and rescheduled the meeting for a different location later that same day. The three men met on the South Side of Chicago in an alley behind a gas station, where Agent Jones opened the back of his van and showed Khattab 100 boxes of pseudoephedrine. Khattab gave Jones $3,000 in cash—double the price that Jones had paid a wholesale supplier for the drugs. Khattab began moving the pseudoephedrine from Jones's van to his own vehicle when other DEA agents, who had been conducting surveillance at the scene, emerged and identified themselves.

Khattab panicked and attempted to flee, but the agents apprehended him about 20 yards away.

Khattab was indicted on one count of attempting to knowingly or intentionally possess or distribute pseudoephedrine with knowledge, or a reasonable cause to believe, that it would be used to manufacture a substance containing detectable amounts of methamphetamine. *See id.* § 846; *see also id.* § 841(c)(2). Khattab waived his right to a jury trial, and in late January 2007 the case proceeded to a bench trial.

At trial, the government introduced testimony from DEA Special Agent Wilfred Taylor, who stated that pseudoephedrine is an over-the-counter drug that is legally used to relieve respiratory congestion. Taylor explained that pseudoephedrine can be converted into methamphetamine, an illicit narcotic that users ingest by sniffing the powder, smoking a mixture containing the powder, or injecting the drug intravenously. Taylor testified that because pseudoephedrine is the key ingredient in manufacturing methamphetamine, it has a high likelihood of being "diverted" for illegal purposes. The risk of diversion has led the DEA to impose many restrictions on the packaging, sale, and purchase of pseudoephedrine. For example, although pseudoephedrine was previously available for retail in bottles containing loose pills, the drug is now sold at the retail level only in "blister packs," with each pill individually wrapped. Taylor indicated that wholesalers still sell cases of pseudoephedrine in loose, bottle form—each case contains 144 bottles of 60 pills, or 8,640 pills per case—but the wholesalers need a DEA license to import, export, or distribute cases.

Taylor also testified about his knowledge of methamphetamine production. He explained that some recipes for manufacturing methamphetamine call for the use of bulk amounts of 60 milligram pseudoephedrine tablets, which leads methamphetamine producers to prefer bottles of loose pills over individually wrapped blister packs because the loose pills allow for more rapid processing. Taylor also noted that methamphetamine producers use the number "8,640" as a code word referring to a bulk amount of pseudoephedrine. And Taylor explained that Khattab was arrested while attempting to possess 57,600 tablets of pseudoephedrine—a bulk amount not intended for personal use that "[could] treat 2,000 people [for respiratory congestion] over a seven-day period."

Taylor testified that in his experience investigating the illicit uses of pseudoephedrine, he had never discovered any legitimate use for bulk quantities of pseudoephedrine that are sold outside of DEA licensing restrictions. Two other DEA witnesses elaborated that they were unaware of any illegal black-market uses of bulk amounts of pseudoephedrine, apart from the production of methamphetamine. The government then presented testimony from Agent Jones and two other DEA agents concerning the attempted drug sale that led to Khattab's arrest.

Additionally, the government introduced transcripts containing English translations of eleven recorded telephone conversations and the April 22 meeting. Agent Jones laid foundation for the admission of the transcripts by identifying the voice on the recordings as Khattab's voice. The government also called a linguist, Bassam Abbasi, who testified that the government transcripts reflected an accurate translation of the Arabic dialogue in

the recordings. The transcripts were admitted into evidence.

The transcript of the April 22 meeting revealed several statements, made either by Khattab or in his presence, that referred to extracting something from pseudoephedrine to create a different substance: "they extract those substances"; "[d]o they extract the same amount from this substance, as from the other substance that they bring from . . . Canada?"; "they'll mix it with the baking soda"; "[t]hey dissolve the medicine, and they extract this substance from it, and they mix it up." The transcript attributed the last statement about dissolving the medicine to Khattab. The dialogue from the meeting also contained references to the resulting substance made from the extracted pseudoephedrine as a narcotic: "the narcotic substances"; "it's a narcotic"; "half and half with the . . . narcotic, uh, substance." In one exchange, Hassan and the unidentified man compared the resulting narcotic substance to "heroin or cocaine." The unidentified man then asked, "[d]o they sniff it or inject it?" Khattab directly answered this question, "No, they sniff it." Khattab explained that "They'll mix with it the baking soda . . . [o]r with cocaine."

The transcript also contained an acknowledgment by Khattab that pseudoephedrine would fetch a higher price if sold in loose bottle form, "[Khattab:] The Canadian stuff. . . . First, it comes loose and ready. [Hassan:] Yeah, this one you have to make it loose by yourself. [Khattab:] No, I can give it to them the way it is, but with a lesser price. It's a cheaper price." The transcripts contained references to the number "8,640." And Khattab impressed upon the other men that "the most important thing" was for the pills to be in 60-milligram doses.

After the government presented its case, Khattab moved for a judgment of acquittal. Khattab's counsel argued that there was no testimony linking Khattab to methamphetamine, which meant that the government had not proven an element of the charged offense—that Khattab knew or had reason to believe that the pseudoephedrine he attempted to purchase would be used to manufacture methamphetamine. *See id.* § 841(c)(2). The district court denied Khattab's motion for a judgment of acquittal, stating that it had yet to fully review the recordings and transcripts in evidence. The district court added that, given its role as the finder of fact, "[the motion] is something that involves arguing the inferences and what inferences are properly drawn and what inferences aren't properly drawn from the evidence, and it just seems to me it's more appropriate for me to do that at the end of the case."

Khattab recalled two of the government's witnesses for the defense case, waived his right to testify, and then rested. After closing arguments, the district court considered the evidence and concluded that it was "just barely" sufficient "to prove beyond a reasonable doubt that Mr. Khattab knew not just that the people he was planning to sell to were up to no good, but that he was going to distribute the product to people who would use it to make methamphetamine." The district court explained that although the voice identifications on the recordings were somewhat "problematic," the statement, "they sniff it," was accurately attributed to Khattab. The district court called this statement "the most incriminating evidence or potentially incriminating evidence." The district court also examined circumstantial evidence of Khattab's knowledge, such as the facts that the participants

discussing the sale used code words and wanted their meetings kept secret. The district court reasoned that Khattab's behavior on May 31 further demonstrated that he knew his actions were "illicit in some way"—"he drove to different locations really without any apparent legitimate purpose, did what appears to be countersurveillance, and finalized the transaction and attempted to transfer the product in a back alley behind a gas station . . . ." The district court accordingly found Khattab guilty as charged in the indictment.

A probation officer prepared a pre-sentence investigation report (PSR), which calculated Khattab's offense level at 38, and his Criminal History Category at II. The probation officer recommended a guidelines sentence of 240 months' imprisonment, based on the PSR. The district court canvassed several of the factors listed in 18 U.S.C. § 3553(a), and sentenced Khattab to a below-guidelines sentence of 144 months' imprisonment, finding that such a sentence was "sufficient to reflect the seriousness of the crime, provide just punishment, promote adequate deterrence, and protect the public." Khattab appealed his conviction; neither Khattab nor the government has appealed the sentence.

## II. ANALYSIS

On appeal, Khattab argues that the evidence was not sufficient to sustain his conviction for attempting to violate 21 U.S.C. § 841(c)(2). *See* 21 U.S.C. § 846. Section 841(c)(2) makes it illegal for any person to knowingly or intentionally possess or distribute "a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a con-

trolled substance . . . ." *Id.* § 841(c)(2). Khattab concedes that the government sufficiently proved that he attempted to knowingly or intentionally possess pseudoephedrine, and he instead focuses on the second element, arguing that the government did not prove that Khattab knew the pseudoephedrine he attempted to possess would be used to manufacture methamphetamine—a controlled substance. *Id.* § 841.

"A defendant making an insufficiency of the evidence argument faces a difficult task." *United States v. Campbell*, No. 06-3606, slip op. at 10-12 (7th Cir. July 15, 2008); *see also United States v. Angle*, 234 F.3d 326, 339 (7th Cir. 2000) ("'Challenging the sufficiency of the evidence is an uphill battle and the defendant bears a heavy burden.'" (quoting *United States v. Wallace*, 212 F.3d 1000, 1003 (7th Cir. 2000))). In reviewing a challenge to the sufficiency of the evidence, "we view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gallardo*, 497 F.3d 727, 737 (7th Cir. 2007) (internal quotation marks and citations omitted); *see also United States v. Henry*, 408 F.3d 930, 933 (7th Cir. 2005). On a sufficiency of the evidence claim, "[w]e do not weigh the evidence or assess the credibility of witnesses." *United States v. Orozco-Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006); *see also United States v. Farris*, No. 07-1643, slip op. at 8 (7th Cir. July 9, 2008).

There is a split among our sister circuits as to the proper interpretation of the *mens rea* requirement in 21 U.S.C. § 841(c)(2)—one circuit believes the statute requires a defendant's subjective knowledge that the drugs he

possesses or distributes will be used to manufacture a controlled substance, while at least three other circuits parse the statute to allow conviction based upon either subjective knowledge or an objective "cause to believe." *Compare United States v. Truong*, 425 F.3d 1282, 1289 (10th Cir. 2005) (requiring government to prove "actual knowledge, or something close to"), *and United States v. Saffo*, 227 F.3d 1260, 1269 (10th Cir. 2000) ("The 'reasonable cause to believe' standard thus comports with the subjective 'guilty mind' or 'guilty knowledge' requirement for imposing criminal liability."), *with United States v. Galvan*, 407 F.3d 954, 957 (8th Cir. 2005) (rejecting proposed jury instruction that required actual knowledge and ignored "reasonable cause to believe" statutory language); *United States v. Kaur*, 382 F.3d 1155, 1157-58 (9th Cir. 2004) ("[C]onsistent with the text of the statute, the instruction incorporates both subjective and objective considerations."); and *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) ("[T]he jury thus needed to find either that he knew the pseudoephedrine would be used to manufacture methamphetamine or that he had reasonable cause to believe that it would be."). The district court applied the more stringent standard of the Tenth Circuit, which requires "actual knowledge, or something close," and concluded that the government sufficiently proved that Khattab knew that the pseudoephedrine he attempted to purchase would be used to manufacture methamphetamine.

But this case is not the proper vehicle for us to weigh in on the circuit split regarding the proper *mens rea* standard for 21 U.S.C. § 841(c)(2). The evidence in the record, construed in the light most favorable to the prosecution, supports the district court's conclusion that Khattab

actually knew that the pseudoephedrine he attempted to purchase from Agent Jones would be used to manufacture methamphetamine. And actual knowledge constitutes *mens rea* under either approach.

Many facts in the record support the conclusion that Khattab actually knew the pseudoephedrine would be used to manufacture methamphetamine. First, there are the numerous statements taken from the transcripts that describe the process of "extracting" a "narcotic" from pseudoephedrine. Whether or not Khattab personally made the statements attributed to him by the transcripts was a matter of some contention at trial. If Khattab made any of these statements, as the transcripts and the district court indicated that he did, then they clearly evince his actual knowledge that the pseudoephedrine could be used to manufacture methamphetamine. The district court identified the statement "they sniff it," as the most damaging statement correctly attributed to Khattab, and we agree that this statement alone reveals that Khattab was fully aware of the potentially illicit uses of pseudoephedrine. Irrespective of who actually uttered the other incriminating statements reported in the transcripts, it is clear that they were made either directly to Khattab, or in his presence, and they too support the district court's finding that Khattab knew the intended use for the pseudoephedrine. *See Truong*, 425 F.3d at 1289.

Khattab insists that the statements alone do not sufficiently prove the government's case because they prove only that Khattab knew that pseudoephedrine *could* be used to make methamphetamine, not that he or the people he planned to distribute it to *would* use it to make methamphetamine. Khattab notes that if his conviction is sustained based upon his knowledge of the mere potential to

turn pseudoephedrine into a controlled substance, then "any individual who purchased Sudafed and knew it could be used to manufacture methamphetamine would be guilty under the statute." Khattab explains that the government put forth no evidence that he was going to manufacture methamphetamine on his own, or that he had a connection to anyone who would receive the pseudoephedrine and turn it into methamphetamine.

But Khattab's argument ignores Agent Taylor's testimony, which frames the transcripts in such a way that reveals the criminality underlying the transaction. Taylor testified at trial that methamphetamine producers prefer loosely packaged pseudoephedrine to the "blister packs" available for retail because the loose pills are easier to process into methamphetamine. Taylor also explained the significance of calculating the dosages of pseudoephedrine tablets to ensure the proper chemistry of methamphetamine. The seemingly innocuous references in the transcripts to the number "8,640," and Khattab's insistence that the pseudoephedrine pills be in 60-milligram doses—"the most important thing"—are damaging when analyzed through the lens of Taylor's testimony. Moreover, Khattab's statement that the "blister packs" would yield a cheaper price than the loose form sold in Canada makes sense in light of Taylor's explanation that methamphetamine producers prefer loose pills because they reduce processing costs. *See Galvan*, 407 F.3d at 957.

Khattab also overlooks the numerous references in the transcripts to a nebulous third party: "*they* extract those substances"; "Do *they* extract the same amount from this substance, as from the other substance that they bring from . . . Canada?"; "*they'll* mix it with the baking soda"; "*[t]hey* dissolve the medicine, and *they* extract this sub-

stance from it, and *they* mix it up." These statements provide circumstantial proof that Khattab had targets in mind who would acquire the pseudoephedrine from him, and that he knew precisely what his targets would do with the pills.

In addition to the statements in the transcripts, there is ample circumstantial evidence that Khattab intended to obtain pseudoephedrine that he knew would be used to produce methamphetamine. *See United States v. Bailey*, 510 F.3d 726, 735 (7th Cir. 2005) ("In proving its case, the government can rely on both direct and circumstantial evidence."). First, there is Khattab's conduct prior to the May 31 DEA sting, which the district court explained indicated Khattab's knowledge that the transaction was "illicit in some way." Khattab grew apprehensive about potential police presence and cancelled the initial meeting. He then rescheduled it and attempted to execute the sale in a back alley behind a gas station after he "drove to different locations really without any apparent legitimate purpose" and "did what appears to be counter-surveillance" prior to finalizing this meeting. And there is also circumstantial evidence derived from the economics of the transaction. According to Taylor, Khattab could not have had a legitimate use for attempting to possess the large volume of pseudoephedrine because purchasing such an amount violated DEA regulations. It also appears there is no illicit use Khattab could have had for enough pseudoephedrine to medically treat 2,000 people for an entire week, other than the manufacture of methamphetamine—two law enforcement officers testified that they knew of no other black-market use for pseudoephedrine. We doubt that Khattab would have purchased such a vast supply of

pseudoephedrine for *double* the retail price without an accompanying demand. The only plausibly rational demand consistent with Khattab's purchase of 57,600 loose pseudoephedrine pills at an inflated price is the production of methamphetamine.

Given the evidence, we do not believe that the government "just barely" met its burden of proof. A rational fact finder could have easily found that the government proved that Khattab knew the pseudoephedrine would be manufactured into methamphetamine.

### III. CONCLUSION

We AFFIRM the district court's judgment of conviction.