In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-3048

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HENRY D. JOHNSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-CR-30046—**Jeanne E. Scott**, *Judge.*

ARGUED JANUARY 7, 2009—DECIDED OCTOBER 14, 2009

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* In a multi-count indictment the government charged Henry D. Johnson with overseeing a gang-related crack distribution operation in Quincy, Illinois. After several participants in the operation testified against him at trial, a jury found Johnson guilty on all counts, including a charge that he engaged in a continuing criminal enterprise ("CCE") between the years 2000 and 2002. *See* 21 U.S.C. § 848. The district

court sentenced Johnson to life imprisonment. *See id.* § 848(a).

Johnson challenges his convictions and sentence in this appeal. He argues that the court committed reversible error in allowing the government to present evidence of his participation in uncharged drug activities and other bad acts. He also argues that the court failed to properly instruct the jurors that they must unanimously agree that Johnson organized, supervised, or managed five or more people to find him guilty of the CCE offense. Finally, Johnson argues—and the government agrees—that his sentence should be vacated and his case remanded for resentencing under *Kimbrough v. United States*, 552 U.S. 85 (2007). We affirm Johnson's convictions but remand for resentencing.

## I.

Johnson was arrested after he sold marijuana and crack to his next-door neighbor who, unbeknownst to Johnson, was cooperating with law enforcement authorities. The government eventually charged Johnson with engaging in a CCE and with nine related conspiracy and drug charges, all involving conduct that occurred between 2000 and 2002. After pleading not guilty, Johnson moved to exclude from trial any testimony describing drug activities or other bad acts that took place before 2000. The district court denied the motion, ruling that evidence of prior bad acts would be allowed to "show the relationship of other individuals to this defendant in an attempt to prove the [CCE] charge."

At Johnson's trial his former best friend, Nolan Nelson, described at length how Johnson rose through the ranks of a street gang known as the Black P-Stone Nation, or the P-Stones, by selling crack and marijuana in Quincy. Over Johnson's objection Nelson provided details regarding Johnson's gang and drug activities from 1993 until 2000. Specifically, Nelson testified that shortly after Johnson moved from Joliet to Quincy in 1993, he encouraged Nelson to join him with the promise that crack sales there were especially lucrative. Nelson agreed and the two became partners, sharing the profits from their drug sales. Their partnership was interrupted in 1994 when Nelson went to prison on drug charges, but when he returned to Quincy in 1998 he and Johnson continued to sell drugs together, with Nelson acting as Johnson's right-hand man. By this time other members of the P-Stones had settled in Quincy, and Johnson was their highest-ranking member. Together, Nelson and Johnson provided crack to lower-ranking P-Stones who would then sell it on the streets. According to Nelson, by 1998 Johnson had the final say on decisions, gave orders to the other gang members regarding drug sales, and meted out punishments (usually, beatings) when he thought his directions were not being followed. During this period Johnson began discussing with Nelson how to better organize the gang to maximize their sales and minimize their risk of being caught.

Nelson also described at length Johnson's drug operations during the period of the charged conduct: 2000 through 2002. He explained that in 2000 he and Johnson had a falling out over whether the amounts of crack that

Johnson wanted to sell made their operation too risky. In the wake of the disagreement, Johnson recruited a new right-hand man, Derrick Phillips. That year Johnson also was named a "Prince," which is the second-highest possible rank within the P-Stones hierarchy. Nelson explained that throughout 2000 and 2001 Johnson ran his crack-distribution operation out of his house in Quincy. Johnson obtained powder cocaine from Kevin Turner, a P-Stone Prince in Chicago who purchased large quantities of cocaine from a Mexican source. Throughout this period members of the P-Stones would drive Johnson or travel with him by train to Turner's house, where they would purchase distribution quantities of cocaine. They would then "cook" the powder cocaine into crack. In 2001 Nelson accompanied Johnson on three of these trips and twice watched Johnson and other P-Stones cook powder cocaine into crack. Nelson testified that he quit selling drugs for Johnson in December 2001 because he was worried about being caught, but said that Johnson continued the operation throughout 2002.

Several witnesses corroborated Nelson's account of Johnson's drug activities during the period of the charged conduct. Kevin Turner testified that he met Johnson in 2000 and began supplying him with cocaine a few months later. He confirmed that between 2000 and 2002 Johnson or his operatives would travel to Turner's house in Chicago every couple of months, purchasing up to a quarter of a kilogram of cocaine at a time. Numerous other trial witnesses, including Craig Abbey, Tomekar Robertson, Joe Ball, and Anthony Buckner, testified that they had accompanied Johnson to Turner's house in

Chicago or made trips there on Johnson's behalf. Johnson would carry a minimum of $7,500 per trip, and sometimes up to $17,000. The witnesses confirmed that Johnson or his operatives then would return to Quincy where they would cook the cocaine into crack and sell it.

Nelson and Ball testified that Johnson established and enforced rules governing the P-Stones' sales of crack in Quincy. Johnson supplied crack to as many as eight lower-ranking street dealers, including Buckner, Robertson, Craig Abbey, Joe Abbey, and Derrick Phillips. At times they worked on rotation, with each street dealer taking a turn selling the available drugs. At other times they worked on a profit-sharing system. Whoever had drugs on a given day would put five bags into a pot, and when all the bags sold, the contributors would split the proceeds. If the street dealers needed more drugs, they would get them from Ball or Johnson himself. Johnson had the authority to elevate members within the gang hierarchy; Craig Abbey testified that in 2002 Johnson made him a "general." That position falls two levels beneath Johnson's role of prince within the P-Stones structure.

Over Johnson's objection, the government solicited the testimony of Mary Green, a self-described crack addict who testified that she purchased drugs from Johnson four or five times during the period of the charged conduct. The majority of Green's testimony focused on the years 1998 and 1999, when she was spending up to $400 per day on crack. Green testified that she funded her habit in part by stealing clothes, and that in 1998 Johnson

asked her to steal children's clothes for him in exchange for crack. She also testified that in 1999 Johnson gave her crack after she built a dog pen in his backyard.

The government also questioned Craig Abbey and Anthony Buckner about Johnson's illegal activities in the years leading up to the charged period. Buckner testified that in 1994 his brother and Johnson were "fighting" and "shooting" at each other in connection with a drug feud. He also explained that throughout 1999 he was purchasing crack from Johnson, whose supplies were plentiful. Buckner gave details about the quantities and costs of crack he bought from Johnson for resale. Abbey testified that he joined the P-Stones in 1998 because he had noticed that Johnson and Nelson wore expensive clothes, shoes, and jewelry despite being unemployed. He also testified that he started selling crack for Johnson that year, giving details about the quantities he sold and the prices he charged.

At the close of evidence, the government and Johnson's attorney disagreed over how the jury should be instructed with respect to the CCE charge. To find Johnson guilty of a CCE offense under 21 U.S.C. § 848, the jury had to conclude that Johnson organized, managed, or supervised at least five or more people in committing a series of underlying drug offenses. Accordingly, the government proposed the following pattern instruction, proffered as instruction 28:

> [T]o find that the defendant acted in concert with five or more persons, you must unanimously agree that the defendant organized, supervised or managed

> five or more persons in committing the series of offenses . . . . However, you do not have to agree on the identity of five or more persons with whom the defendant acted.

In response Johnson's attorney asked for a special verdict form requiring the jury to identify the five people referenced in the proposed instruction. The government argued that the jury is not required to agree unanimously on the identity of the five people, then moved to withdraw instruction 28. Johnson did not object, but later he asked the court to modify the verdict form for the CCE offense to require the jury to identify the five people. The district court denied the request. When the jury reconvened, the court instructed them regarding the elements of the CCE offense. With respect to the five people, the court instructed the jury that "the Government must prove that the defendant organized, supervised, or managed them in accomplishing the activities that contribute[d] to the continuing enterprise." It also instructed the jury that its verdict on each count "must be unanimous."

The jury found Johnson guilty on all counts, including the CCE charge, which carried a statutory minimum sentence of twenty years' imprisonment and a maximum sentence of life imprisonment. *See* 21 U.S.C. § 848(a). A probation officer prepared a presentencing report calculating the drug quantity for which Johnson should be held accountable. Based on the trial testimony, the probation officer determined that Johnson was accountable for 1,472.58 grams of cocaine, 10,679.76 grams

of crack, and 22,680 grams of marijuana. Converting the cocaine and crack amounts to their marijuana equivalent, *see* U.S.S.G. § 2D1.1, cmt. n.10, the probation officer concluded that Johnson was accountable for the equivalent of 213,912 kilograms of marijuana.

Johnson raised a pro se objection to the probation officer's drug calculation, arguing that the 100:1 penalty ratio for an offense involving crack versus powder cocaine is unreasonable. At the sentencing hearing, which took place before the Supreme Court decided *Kimbrough v. United States*, 552 U.S. 85 (2007), the district court did not expressly address this objection, but adopted the probation officer's drug calculation. Because the offense involved the equivalent of 213,912 kilograms of marijuana the court assigned a base offense level of 38, *see id.* § 2D1.1(c), then added four levels because Johnson was involved in a CCE, *see id.* § 2D1.5(a)(1), and two levels for possession of a firearm during the offense, *see id.* § 2D1.1(b)(1). Applying the resulting total offense level of 44 to Johnson's criminal history category of II, the court determined that the guidelines range was life imprisonment. After considering various sentencing factors under 18 U.S.C. § 3553(a), the court sentenced Johnson to life imprisonment.

## II.

### A.  Evidence of Prior Bad Acts

On appeal Johnson argues that the district court erroneously allowed the government to solicit testimony from

numerous witnesses regarding Johnson's drug and gang activities in the years leading up to the period of the charged conduct. Johnson argues that this testimony should have been excluded under Federal Rule of Evidence 404(b), because, he says, it created the imper-missible risk that the jury would assume that he was predisposed to commit the charged drug crimes. We review the district court's decision to admit evidence under Rule 404(b) for abuse of discretion only. *See United States v. Jones*, 455 F.3d 800, 806 (7th Cir. 2006).

Although Rule 404(b) prohibits evidence of prior bad acts when it is admitted to show that a defendant has a tendency to commit crimes or otherwise is of questionable character, such evidence "may be admissible" to clarify material issues other than character. Fed. R. Evid. 404(b). The rule provides a list of those other material issues, including criminal intent, motive, knowledge, identity, or the absence of mistake. *Id.*; *see also United States v. Harris*, 536 F.3d 798, 807 (7th Cir. 2008). But Rule 404(b)'s list is "not exhaustive," *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir. 2008), and we have held that evidence of prior drug transactions may be admissible to prevent jury confusion about a witness's relationship with the defendant, *id.*, and to "elucidate their ongoing business relationship," *Harris*, 536 F.3d at 808. Moreover, evidence of prior bad acts can be introduced in conspiracy cases to "show the formation of the conspiracy or the prior relationship between conspirators." *United States v. Prevatte*, 16 F.3d 767, 776 (7th Cir. 1994).

Here the district court admitted evidence of Johnson's prior gang and drug activities principally to provide

the jury with background to explain Johnson's leader-
ship role in the Quincy branch of the P-Stones and to
clarify the relationship between Johnson and his alleged
coconspirators. It also admitted the testimony to allow
the government to demonstrate Johnson's intent to dis-
tribute drugs "based on his prior relationship with" the
witnesses and to show his knowledge of the drugs being
sold. Johnson argues that these reasons are "unhelpfully
vague" and that the court's ruling opened the door to
a slew of highly prejudicial propensity evidence. He
objects in particular to Nelson's lengthy testimony ex-
plaining the history of Johnson's role in developing a
branch of the P-Stones in Quincy, to several co-conspira-
tors' descriptions of pre-2000 drug transactions with
Johnson and references to his expensive clothes and
jewelry, and to Mary Green's testimony that Johnson told
her to steal children's clothes in exchange for crack.

The district court properly permitted Nelson and other
co-conspirators to testify about their interactions with
Johnson in the years leading up to 2000. By pleading not
guilty to the CCE charge, Johnson put squarely at
issue whether he was in control of at least five other
people in an ongoing drug operation. *See* 21 U.S.C. § 848.
The evidence of his drug and gang activities before the
period of the charged conduct explained how Johnson
gained that control and why the lower-ranking gang
members were willing to take direction from him.
Nelson's testimony explained how Johnson went from
dealing drugs with just one partner in the mid-1990s to
developing a network of gang members who sold drugs
at his direction by 2000. The testimony about Johnson's

expensive clothes and jewelry explained the witnesses's motive to join the conspiracy and submit to Johnson's leadership. The testimony thus helped prevent jury confusion about Johnson's relationship with his underlings and to explain how those relationships formed into a conspiracy. *See Taylor*, 522 F.3d at 735; *Prevatte*, 16 F.3d at 776.

Recognizing the danger of a propensity inference, the district court took steps to ensure that the jury understood the permissible purpose of the prior bad acts testimony. The court instructed the jurors to consider the testimony "for the limited purpose of showing the relationship" between Johnson and the witnesses, "[t]heir interaction, the nature of their relationship, and to show the intent of the defendant and his possible leadership role with respect to the others." (7/06/05 Tr. at 1451-52.) The limiting instructions informed the jurors that the prior bad acts testimony was relevant only to help them understand how Johnson had risen to a leadership role in the conspiracy, a question that was central to the CCE charge. We presume that the jurors abided by the limiting instructions. *See United States v. Dennis*, 497 F.3d 765, 769 (7th Cir. 2007).

Having concluded that the testimony from Nelson and the other crack dealers regarding Johnson's pre-2000 drug activities served a permissible purpose, we must ask whether the testimony described events that were "similar enough and close enough in time" to the charged conduct, whether it was "sufficient to support a jury finding that the defendant committed the similar act," and

whether the testimony's probative value outweighed its possible prejudicial effect. *United States v. Moore,* 531 F.3d 496, 499 (7th Cir. 2008); *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007). All three of those criteria are satisfied here. The witnesses described drug transactions that were substantially similar to those that took place in the charged period. All of the witnesses who testified that they bought crack from Johnson or sold it on his behalf in the years leading up to 2000 also described their participation in similar crack transactions during the charged period. The earliest of the prior drug transactions took place six years before the period of the charged conduct. We have held that a six-year gap is sufficiently close in time to fall within the rule. *See Jones*, 455 F.3d at 809; *United States v. Puckett*, 405 F.3d 589, 597 (7th Cir. 2005). The evidence was sufficient to support a jury finding of guilt on the previous drug transactions: the witnesses gave similar descriptions of the types and amounts of drugs Johnson sold and of his trips to Chicago to obtain cocaine. And the value of this testimony in explaining how Johnson formed his operation far outweighed any prejudicial effect of alerting the jury that Johnson had sold drugs in the period leading up to his ascension to the second-highest rank in the P-Stones. There was nothing especially "emotional or incendiary" about the witnesses' descriptions of past drug transactions, *see Harris*, 536 F.3d at 809 (quotation omitted), especially in the context of a long trial detailing numerous similar transactions within the charged period.

The same cannot be said for Mary Green's testimony, which is by far the most troubling of the prior bad acts

evidence. Green testified that in 1998 Johnson asked her to steal children's clothes for him in exchange for crack. She explained at some length how she stole the clothing and described the small sizes she targeted. At oral argument counsel for the government struggled to articulate what could possibly be the probative value of this testimony, and in fact counsel conceded that the government went too far in soliciting these details. We agree. The prejudicial effect of testimony showing that Johnson had a crack addict stealing clothes for small children certainly outweighed what little probative value such testimony may have added. It is difficult to see how this testimony served any purpose other than to suggest that Johnson is a bad person, and one with access to small children at that.

But the district court's error in allowing this testimony does not require us to reverse his conviction. *See United States v. Lee*, 558 F.3d 638, 649 (7th Cir. 2009) (noting that Rule 404(b) error can be harmless); *Taylor*, 522 F.3d at 735 (same). Green's testimony represents less than 30 pages out of over 1500 pages of trial transcript, a small island in a sea of evidence of Johnson's guilt. Multiple witnesses testified at length regarding Johnson's leadership role in the Quincy drug operation. They testified that they sold crack for Johnson throughout the charged period, giving details about how he obtained the crack and established procedures for the gang's drug sales. Johnson provided no evidence of his own to rebut that testimony, and given the weight of the evidence supporting Johnson's conviction, we conclude with fair assurance that the district court's error in admitting the

Green testimony had no sway on the jury, and therefore was harmless. *See Taylor*, 522 F.3d at 735; *Dennis*, 497 F.3d at 769-70.


**B.  The CCE Instructions**

The CCE statute is designed to target the "top brass" of drug operations, *United States v. Markowski*, 772 F.2d 358, 360-61 (7th Cir. 1985) (quotation omitted), and thus requires the government to prove that the defendant managed or organized at least five or more people in the course of committing a "continuing series" of drug offenses, 21 U.S.C. § 848(c). Johnson argues that his CCE conviction must be reversed because, according to him, the district court never instructed the jury that it had to agree unanimously that Johnson managed, supervised, or organized at least five other individuals.

In challenging the jury instructions Johnson first argues that the court erred in refusing to instruct the jury that it must agree unanimously on the identity of each of the five managed individuals. But we have held that the jury is *not* required to agree on the identity of the five people whom a defendant managed or supervised in the context of a CCE. *United States v. Hardin*, 209 F.3d 652, 659-60 (7th Cir. 2000); *United States v. Gibbs*, 61 F.3d 536, 538 (7th Cir. 1995); *cf. Richardson v. United States*, 526 U.S. 813, 824 (1999) (assuming, without deciding, that a jury need not agree on the identities of the five managed persons). Here the jury heard evidence suggesting that Johnson managed or supervised more than five people, including Nelson, Phillips, Buckner, Ball,

Robertson, Craig Abbey, Joe Abbey, and numerous un-named street dealers. The CCE statute requires only that the jurors conclude that Johnson managed at least five from this pool; it does not require them to agree on which five. *See* 21 U.S.C. § 848; *United States v. Herrera-Rivera*, 25 F.3d 491, 497 (7th Cir. 1994).

Recognizing that his first argument is foreclosed, Johnson argues that at the very least, the district court should have given this circuit's pattern CCE instruction, which states: "[i]n order to find that the defendant acted in concert with five or more persons, you must unanimously agree that the defendant organized, supervised or managed five or more persons in committing the series of offenses." *See* Seventh Cir. Pattern Inst., "21 U.S.C. § 848, Continuing Criminal Enterprise—Five or More Persons," available at http://www.ca7.uscourts.gov/pjury.pdf. The government proffered the pattern instruction at the initial jury-instruction conference as proposed instruction 28, but later withdrew it. Johnson did not object to the withdrawal, but he now argues that the district court erroneously omitted the instruction. According to Johnson, without the pattern instruction we cannot be sure that the jurors unanimously agreed that he fulfilled the required managerial role.

The parties dispute whether Johnson properly preserved for appeal his challenge to the legal sufficiency of the CCE jury instructions. Defense counsel did not object when the government withdrew proposed instruction 28, but Johnson argues that his counsel's request for a heightened unanimity instruction with respect to the

identity of the managed people demonstrates that at a minimum he wanted the pattern instruction to be given. If trial counsel's requests sufficiently preserved the issue, we would review the district court's failure to give the pattern instruction de novo, *see United States v. DeSantis*, 565 F.3d 354, 359 (7th Cir. 2009); if Johnson forfeited the issue by failing to object, we would review it for plain error only, *see id.* at 361. We need not decide whether Johnson preserved the issue in the scuffle over proposed government instruction 28, because his challenge fails under either standard. *See, e.g., United States v. Garcia*, ___ F.3d ___, 2009 WL 2750261, at *13 n.5 (7th Cir. Sept. 1, 2009).

In reviewing the sufficiency of jury instructions, we look to the instructions as a whole to determine whether "the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." *United States v. Berndt*, 530 F.3d 553, 555 (7th Cir. 2008) (quoting *United States v. Fawley*, 137 F.3d 458, 467 (7th Cir. 1998)). Jury instructions are sufficient if, taken together, they convey the issues "fairly and accurately." *United States v. Souffront*, 338 F.3d 809, 834 (7th Cir. 2003) (quotation omitted). We would reverse only if the instructions, viewed in their entirety, "mislead the jurors to the litigant's prejudice." *See United States v. Smith*, 223 F.3d 554, 566 (7th Cir. 2000) (quotation omitted).

Viewed as a whole, the district court's instructions were sufficient to ensure that the jury members understood that they could find Johnson guilty of the CCE offense only if they unanimously agreed that he managed

or supervised at least five people. The district court informed the jury that to prove Johnson's involvement in a CCE the government was required to prove beyond a reasonable doubt that Johnson organized, supervised, or managed more than five people. The court emphasized that if the government did not prove that element of the CCE charge beyond a reasonable doubt, the jury must find Johnson not guilty. The court also informed the jury that its "verdict on each count, whether it be guilty or not guilty, must be unanimous." Although perhaps the pattern instruction would have communicated the unanimity requirement more clearly, the combination of instructions sufficiently conveyed to the jury its duty to decide unanimously whether the government met its burden on every element of the charged offenses. Johnson has not explained how the jury could reach a unanimous verdict on the CCE charge without unanimously agreeing on all of the required elements of the CCE offense. Accordingly, we conclude that the court's instructions fairly and accurately informed the jury that it was required to agree unanimously on every element of the CCE offense, including Johnson's managerial role. *See United States v. Palivos*, 486 F.3d 250, 257 (7th Cir. 2007).

## C.  Johnson's Sentence

The parties agree that Johnson is entitled to have his sentence vacated and his case remanded so that the district court may consider whether the disparate treatment of crack versus powder cocaine under the guidelines applicable at the time he was sentenced renders his life sentence unreasonable. Circuit precedent at the

time of Johnson's sentencing precluded the district court from questioning the 100:1 ratio of the weight of crack cocaine to the weight of powder cocaine then used in the sentencing guidelines. *See United States v. Taylor*, 520 F.3d 746, 746-47 (7th Cir. 2008); *United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006). Johnson nonetheless raised a pro se challenge to the ratio in his objections to the presentencing report. The district court did not address the challenge at sentencing, likely because to do so at the time would have been "spitting against the wind." *See Taylor*, 520 F.3d at 747. But after Johnson filed this appeal the Supreme Court decided *Kimbrough v. United States*, 552 U.S. 85 (2007), holding that the district court may sentence a crack offender below the guidelines range if it believes the 100:1 ratio results in a greater sentence than is necessary under the sentencing factors set forth in 18 U.S.C. § 3553(a). Because Johnson preserved his challenge to the sentencing disparity, and because nothing in the record tells us whether the district court would have in its discretion imposed a different sentence after *Kimbrough*, we must vacate Johnson's sentence and remand for resentencing. *See United States v. Bush*, 523 F.3d 727, 728 (7th Cir. 2008); *United States v. Padilla*, 520 F.3d 766, 774-75 (7th Cir. 2008).

## III.

For the foregoing reasons, Johnson's convictions are AFFIRMED. His sentence is VACATED and the case is REMANDED for resentencing.