In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-2652 & 09-3011

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

IVAN REA, a/k/a OSCAR CAMACHO-DIAZ,
a/k/a MICHOACAN, a/k/a ALEX,
and JOSE L. MEDINA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:07-cr-00038—**Larry J. McKinney**, *Judge.*

ARGUED MAY 26, 2010—DECIDED SEPTEMBER 2, 2010

Before RIPPLE, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* This is the consolidated appeal
of drug dealers Ivan Rea and Jose Medina. A jury con-
victed both Defendants and they now appeal various
aspects of their convictions and sentences.

## I. BACKGROUND

Ivan Rea is also known by a variety of nicknames including "Michoacan." He received forty pounds of methamphetamine every two weeks in Indianapolis, which he purchased from sources in Denver. He directed others to help him cut, weigh, package, transport, and distribute the meth. Rea also fronted the methamphetamine to others for resale and used his drug runners to collect the money owed him. Medina was a distributor who sold methamphetamine for Rea.

On September 24, 2008, a grand jury returned a three-count indictment charging Rea and Medina with conspiracy to distribute in excess of 500 grams of a mixture containing methamphetamine, in violation of 21 U.S.C. § 846; charging Rea with conducting a continuous criminal enterprise ("CCE"), in violation of 21 U.S.C. §§ 848(a) and (b); and charging Rea with being an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A).

Following a joint trial in March 2009, the jury found Rea and Medina guilty of conspiracy, and found Rea guilty of engaging in a CCE. In June 2009, the district court sentenced Rea to two concurrent life sentences, one each for conspiracy and for engaging in a CCE, and entered a $100 special assessment for each count. In July 2009, the district court sentenced Medina to 350 months' imprisonment, 5 years' supervised release, and entered a $100 special assessment.

## II. ANALYSIS

### A. Ivan Rea

Rea presents several arguments on appeal. First, Rea argues that his convictions and sentences for conspiracy and engaging in a CCE violate the Double Jeopardy Clause, requiring that one of his convictions be vacated. Second, Rea argues that the government's evidence was insufficient to support a guilty verdict for participating in a CCE. Third, he argues that the district court abused its discretion by admitting hearsay testimony that identified Rea as the source of methamphetamine. Finally, he argues that the district court committed plain error in calculating his base offense level for sentencing purposes by adding two levels for possession of a firearm during the commission of the offense. We take each argument in turn.

### 1. Double Jeopardy Violation

Rea argues that the district court's imposition of two concurrent life sentences for conspiracy and for engaging in a CCE violates the Fifth Amendment's Double Jeopardy Clause because the convictions and sentences were based on the same underlying conduct—an agreement. Because Rea did not raise his double jeopardy defense before the district court, we review the district court's judgment for plain error. Fed. R. Crim. P. 52(b); *United States v. Crowder*, 588 F.3d 929, 938 (7th Cir. 2009).

The Double Jeopardy Clause prohibits multiple punishments for the same offense. *Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983). To determine whether the same act or conduct constitutes one offense or two, we must determine "whether each [statutory] provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The offenses are considered to be the same if the first offense is a lesser included offense of the second. *United States v. Loniello*, 610 F.3d 488, 491 (7th Cir. 2010) ("If one statute has an element missing from the second, but all of the second's elements are in the first, then the second is a lesser included offense of the first."). Where two charged offenses are determined to be the same, the Double Jeopardy Clause limits conviction and sentencing to only one of the charged offenses, unless Congress intended otherwise. *Rutledge v. United States*, 517 U.S. 292, 297 (1996); *United States v. Pao Xiong*, 595 F.3d 697, 698 (7th Cir. 2010).

The Supreme Court in *Rutledge v. United States* held that conspiracy to distribute controlled substances is a lesser included offense of engaging in a CCE. 517 U.S. at 300, 307. The Court noted:

> [B]ecause the plain meaning of the phrase "in concert" signifies mutual agreement in a common plan or enterprise, we hold that this element of the CCE offense requires proof of a conspiracy that would also violate § 846. Because § 846 does not require proof of any fact that is not also a part of the CCE offense, a straightforward application of the *Blockburger* test leads to the conclusion that

> conspiracy as defined in § 846 does not define a different offense from the CCE offense defined in § 848. Furthermore, since the latter offense is the more serious of the two, and because only one of its elements is necessary to prove a § 846 conspiracy, it is appropriate to characterize § 846 as a lesser included offense of § 848.

*Id*. at 300. In *Rutledge*, as in the case at hand, the sentences imposed for conspiracy and for conducting a CCE were concurrent life sentences, and each carried a special assessment. *Id*. at 294. Finding that Congress did not intend punishments for both offenses, even if only because each conviction carried with it a special assessment, *see id.* at 301 (distinguishing concurrent sentences as multiple punishments when special assessments are imposed for each offense), the Court vacated one of the underlying convictions and the concurrent sentence based on it, *id*. at 307.

Here, Rea argues that under *Rutledge* the conspiracy alleged in his indictment is a lesser included offense of the CCE and that, along with a special assessment for each, his concurrent sentences thus amount to cumulative punishment not authorized by Congress. Because the government concedes Rea's argument, and we agree, we vacate Rea's conviction and sentence for conspiracy. We do not remand Rea's case, however, because, as noted below, we affirm Rea's CCE conviction and sentence.

2. *Sufficiency of the Evidence*

Rea contends that the evidence against him was insufficient to support his CCE conviction. Rea faces an uphill battle in bringing this challenge on appeal. *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009). On a challenge to the sufficiency of the evidence, we ordinarily review the evidence in the light most favorable to the government, and we will overturn the conviction only if there is no evidence upon which a rational juror could have found the defendant guilty. *United States v. Hampton*, 585 F.3d 1033, 1040 (7th Cir. 2009). In conducting this analysis, we do not reweigh the evidence or evaluate the credibility of the witnesses. *United States v. Khattab*, 536 F.3d 765, 769 (7th Cir. 2008).

The government argues that Rea faces a heightened standard today because he waived his appellate challenge by failing to raise this issue in a Rule 29 motion for judgment of acquittal at the district court. *See* Fed. R. Crim. P. 29; *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir. 1996). When a defendant waives his challenge, we will only reverse his conviction if we find a "manifest miscarriage of justice" under the plain error standard of review. *United States v. Hensley*, 574 F.3d 384, 390 (7th Cir. 2009). "Manifest miscarriage of justice is perhaps the most demanding standard of appellate review." *United States v. Turner*, 551 F.3d 657, 662 (7th Cir. 2008) (*quoting United States v. Taylor*, 226 F.3d 593, 597-98 (7th Cir. 2000)). In other words, "reversal is warranted only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction

would be shocking." *Hensley*, 574 F.3d at 390-91 (*quoting United States v. Irby*, 558 F.3d 651, 653 (7th Cir. 2009)) (internal quotation marks omitted).

At the close of trial testimony, Medina's counsel made a verbal motion for judgment of acquittal. This motion was followed by Rea's counsel saying, "We do not believe on behalf of Mr. Rea we have a good-faith basis to make a recommendation with respect to 29B. However, we would like to make a similar presentation with respect to evidence." (Tr. at 734.) Rea argues that his counsel's subsequent remarks in effect adopted Medina's motion.

Rea is incorrect in several respects. We begin by stating the obvious—Rea's counsel specifically stated there was no basis to make a Rule 29 motion. Now, however, Rea attempts to pin his sufficiency of the evidence argument to his counsel's comment about making a presentation "with respect to evidence." But as the trial transcript makes abundantly clear, Rea's counsel's reference to "evidence" referred to Rea's decision whether or not to testify, *not* to the sufficiency of the evidence argument. The district court subsequently addressed Rea's decision during colloquy and Rea ultimately announced his decision not to testify. (Tr. at 735-36.) To construe Rea's counsel's comments as somehow preserving a sufficiency of the evidence argument for appeal is inaccurate at best and an attempt to mislead this court at worst. We also find no reason why Rea should benefit from Medina's counsel's Rule 29 motion—especially in light of Rea's admission, through his attorney, that he did not have

a good-faith basis for bringing a Rule 29 motion. We therefore find that Rea waived his sufficiency of the evidence challenge to his conviction.

Even had Rea not waived this argument, we would still affirm his conviction because the evidence was sufficient to sustain a verdict against Rea for engaging in a CCE. *See, e.g., United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008).

To carry its burden that Rea engaged in a CCE under 21 U.S.C. § 848, the government had to prove beyond a reasonable doubt that Rea "organized, managed, or supervised at least five or more people in committing a series of underlying drug offenses." *United States v. Johnson*, 584 F.3d 731, 735 (7th Cir. 2009). "[T]he government need not show that the five individuals acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of [them]." *United States v. Rogers*, 89 F.3d 1326, 1334 (7th Cir. 1996) (*quoting United States v. Moya-Gomez*, 860 F.2d 706, 746 (7th Cir. 1988)) (internal quotation marks omitted) (second alteration in original). All that is required of the government is to establish that "the defendant exerted some type of influence over five other individuals in the course of the criminal enterprise." *Id*. at 1334-35.

Although the government need not prove that the defendant managed five people simultaneously, we have previously held that "[t]he dealer's need to replace his aide . . . would not authorize a CCE prosecution on the theory that the small-timer had one servant in

January, a second in February, a third in March, and so on." *United States v. Bond*, 847 F.2d 1233, 1237 (7th Cir. 1988). Under such a structure, "[t]he organization would never be larger than two." *Id*.

Rea's sole argument on appeal is that the government failed to establish by sufficient evidence that he organized, supervised, or managed at least five other individuals in his meth operation. Rea contends that he initially had only one underling, Pablo Chavez, whom he later replaced with two others, Jose Nunez and Edgar Badillo-Rangel. Rea claims that all of the other players with whom he dealt were not under his control. Instead, he alleges that they were independent wholesale purchasers with their own customer bases and that a mere buyer-seller arrangement existed between them and himself.

The government maintains that the evidence at trial was sufficient to establish that Rea directed the activities of Chavez, Nunez, Badillo-Rangel, Sarai Solano, Jose Medina, William Dunlop, and at least two or three other drug runners. We agree that the government presented sufficient evidence at trial, primarily in the form of witness testimony, that would enable a reasonable jury to conclude that Rea organized, managed, or supervised at least five individuals.

Rea directed his employees to unload, cut, cook, package, and deliver methamphetamine for him. Rea also used his drug runners to collect money that was owed him for meth that he had fronted his distributors. Beginning in October 2005, and up to the time of his arrest in mid-

2006, Chavez delivered meth and collected money for Rea. Prior to Chavez's arrest, however, Rea also hired Nunez and Badillo-Rangel. Eden Soto, who frequently purchased and redistributed meth from Rea, testified that Rea would dispatch three or four drug runners to deliver the drugs and collect fronted money. Rea also supervised and directed Solano, Nunez's girlfriend. Solano worked as a waitress at Rea's restaurant, but she would also go on runs with Nunez; she was also responsible for obtaining the materials used to cut, package, and conceal the odor of the meth.

Rea argues that his relationship with Chavez morphed into that of buyer-seller at some point prior to Chavez's arrest, and that he merely "replaced" Chavez with Nunez and Badillo-Rangel. The government, however, presented more than sufficient evidence to establish that Rea simultaneously directed multiple drug runners, and that Nunez in fact worked for Rea prior to the purported change in relationship between Rea and Chavez.

In addition to the evidence supporting the fact that Rea directed Chavez, Nunez, Badillo-Rangel, and Solano, among several other drug runners, the government also presented evidence that Rea directed Medina and Dunlop. Rea fronted the meth to Medina, and Medina would then re-sell the drugs and pay Rea's runners when they came to collect. Dunlop was a regular customer of Medina's and would often buy from him at Medina's tire shop. However, when Medina failed to meet his financial obligation on the meth that Rea had fronted him, Rea directed Dunlop to renovate the tire

shop and Rea took it over. Rea then instructed Dunlop that he would buy direct from him and Nunez. Although Rea argues that Medina and Dunlop were not under his control, a reasonable jury could certainly conclude based on this evidence that Rea exercised some type of influence and control, either direct or indirect, over them.

It is clear that Rea was no small-time drug dealer; rather, Rea ran an extensive drug organization, wherein he directed at least five or more people and trafficked high quantities of methamphetamine. Accordingly, we conclude that the evidence presented against Rea was sufficient to justify his CCE conviction.

### 3. Hearsay Testimony

Rea also argues that his convictions should be reversed and remanded for a new trial because the district court allowed hearsay testimony from witnesses who identified him as a source for meth.

Rea must shoulder a heavy burden on appeal when challenging admissions of evidence at trial. *See United States v. Taylor*, 604 F.3d 1011, 1014 (7th Cir. 2010). We review a district court's evidentiary rulings, such as the admission of out-of-court statements, for an abuse of discretion. *United States v. Jones*, 600 F.3d 847, 853 (7th Cir. 2010).

Rea first contends that several statements made by Seferino Rodriguez and Eden Soto as witnesses at trial were inadmissible hearsay because they did not fall within the exception to the hearsay rule for the declara-

tions of co-conspirators. These statements included (1) Edgar Boyzo-Bernal's statement to Rodriguez identifying Rea as his source; (2) Luis Briseno's statement to Rodriguez identifying Rea as his source; (3) Boyzo-Bernal's statement to Soto identifying Rea as his source; (4) Briseno's statement to Soto identifying Rea as his source; and (5) Cholo's[1] statements to Soto that he owed Rea money for meth and that Rea would be a "good connect" for meth.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible unless an exception applies. Fed. R. Evid. 802. Rule 801(d)(2)(E) of the Federal Rules of Evidence, however, excludes from the definition of hearsay statements "offered against a party" that are "statement[s] by a co-conspirator of a party during the course and in furtherance of the conspiracy." For co-conspirator statements to be admissible, "the government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Harris*, 585 F.3d 394, 398 (7th Cir. 2009) (*quoting United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008)).

---

[1] "Cholo" is the name for a friend of Eden Soto who taught Soto how to deal meth and who was present during a meeting between Soto and Rea.

"We review the district court's findings with regard to these elements for clear error." *United States v. Skidmore*, 254 F.3d 635, 638 (7th Cir. 2001).

The fact that there was a conspiracy is not in dispute. Rather, the thrust of Rea's argument is that these statements were either not made by a co-conspirator or not made in furtherance of the conspiracy. Although Rea argues that some of the statements were made by individuals who were not part of the conspiracy, a prosecutor need not charge a conspiracy to take advantage of Rule 801(d)(2)(E). *United States v. Moon*, 512 F.3d 359, 363 (7th Cir. 2008). Statements that further the conspiracy may take a variety of forms, "including comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members." *Skidmore*, 254 F.3d at 638 (*quoting United States v. Johnson*, 200 F.3d 529, 532 (7th Cir. 2000)).

Rea's attempt to label all five challenged out-of-court statements as impermissible hearsay is too broad and unpersuasive. As previously discussed, Chavez, Nunez, Badillo-Rangel, and Solano, among others, all worked directly for Rea and assisted him in preparing and delivering meth to his distributors. Rea used Edgar Boyzo-Bernal, Luis Briseno, Eden Soto, Jose Medina, and William Dunlop as his distributors. Seferino Rodriguez purchased significant quantities of meth from Boyzo-Bernal (also known as "Gavacho" to Rodriguez), Luis

Briseno, and Chavez. Rodriguez testified that at different times Boyzo-Bernal and Briseno identified Rea as their source. Soto testified that Rea and Cholo met at Soto's apartment and Cholo told Soto that he owed Rea money and that "Michoacan" would be a "good connect" for Soto. Soto met with Rea two days later at Rea's restaurant where Rea agreed to supply Soto with meth. Soto also provided significant testimony, including testimony regarding telephone conversations intercepted by the DEA, discussion of Rea's runners and distributors, and his dealings with Rea. In particular, Soto testified that Badillo-Rangel, Nunez, and Chavez were runners for Rea; Boyzo-Bernal and Briseno distributed for Rea at the same time Soto did, and each identified Rea as their source; and at various times Soto received one pound of meth per week from Rea.

We find that the statements Rea challenges either were generally part of the ordinary "information flow" by and among conspirators or served to inform members about the current status of the conspiracy. *See United States v. Hunt*, 272 F.3d 488, 495 (7th Cir. 2001). Although Rea attempts to distinguish between statements based on the context in which each was made—which varied from transactional in nature to more generalized statements—we conclude that the government clearly proved by a preponderance of the evidence that the statements were made by co-conspirators in furtherance of the conspiracy. *See Johnson*, 200 F.3d at 533 (stating that while we evaluate the context of the statement with regard to whether the statement advanced the conspiracy, "the statement need not have been made

exclusively, or even primarily, to further the conspiracy," and that we need only find "some reasonable basis for concluding that the statement in question furthered the conspiracy in some respect." (*quoting United States v. Powers*, 75 F.3d 335, 340 (7th Cir. 1996)) (internal quotation marks omitted)). Because it is reasonable to conclude that the co-conspirator statements identifying Rea as the source of meth were well within the wide range of statements admissible under Rule 801(d)(2)(E), the district court did not err by admitting them.

Drug Enforcement Agency (DEA) Agent Davis testified at trial about his conversation with Pablo Chavez following Chavez's arrest, at which time Chavez identified his source for meth as "Michoacan." Rea also contends that Agent Davis's statements were inadmissible hearsay and that their admission violated the Confrontation Clause.

The government argues that because the statement was offered only to show that Agent Davis performed a thorough investigation (because Rea claimed Davis's failed attempt to perform a controlled purchase from him resulted in a lack of hard evidence against him) and that the statement referred to "Michoacan," and not Rea by name or photograph, the statement was not offered to prove that Rea was in fact Chavez's source.

While we are tempted to delve into the details of Rea's challenge, we find it unnecessary and therefore decline to do so. The government presented a mountain of evidence, including multiple witnesses testifying that they engaged directly with Rea in dealing meth, recorded

conversations of Rea dealing meth, and numerous other statements by co-conspirators. There is substantial additional evidence demonstrating that Rea was a supplier for Chavez and that Chavez was a drug runner for Rea. The district court might have prevented Agent Davis's statement from being an issue on appeal by giving a limiting instruction to the jury; however, any error in the admission of this testimony was harmless under the circumstances. *Cf. United States v. Prieto*, 549 F.3d 513, 523 (7th Cir. 2008).

In summary, we conclude that the district court did not abuse its discretion by admitting the statements made by Rea's co-conspirators, and that any error related to Agent Davis's testimony was harmless.

*4. Sentencing*

Rea's final argument on appeal is that the district court erred in calculating his offense level by imposing a two-level enhancement for possession of guns during the commission of the offense. Rea, however, did not object to the calculation in the pre-sentence investigation report (PSR), and he failed to challenge the calculation before the district court. We therefore review the district court's imposition of Rea's sentencing enhancement for plain error, and we will not remand unless the error affected his substantial rights. *United States v. Avila*, 557 F.3d 809, 822 (7th Cir. 2009).

Under § 2D1.1(b)(1) of the Sentencing Guidelines, a two-level enhancement is applied to a defendant's base offense level if the defendant's drug offense involved

the possession of a firearm. *See, e.g., United States v. Gonzalez*, 608 F.3d 1001, 1006 (7th Cir. 2010). The government must first prove by a preponderance of the evidence that the defendant possessed the firearm. *United States v. Are*, 590 F.3d 499, 526 (7th Cir. 2009). "The defendant need not have actual possession of the weapon; constructive possession is sufficient." *Id*. To prove the firearm was possessed in connection with a drug offense, it is enough to show that the gun was in "close proximity" to the drugs in question. *Id*. (*quoting United States v. Souffront*, 338 F.3d 809, 833 (7th Cir. 2003)). This includes proximity to drug paraphernalia, such as a scale. *United States v. Cashman*, 216 F.3d 582, 589 (7th Cir. 2000). We have also approved an enhancement under § 2D1.1 "where the weapon was not found in the same place as illegal drugs." *Are*, 590 F.3d at 527.

If the government carries its burden, then the defendant must prove that it was "clearly improbable" that a connection existed between the firearm and the drug offense. *Id*. at 526; *see* Application Note 3 to § 2D1.1 ("The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.").

Pursuant to a search warrant for Rea's residence in February 2007, authorities found a loaded AK-47 assault rifle in the hall closet, a loaded .380 caliber Smith & Wesson handgun in the west bedroom, and a .38 caliber Taurus revolver in the southwest bedroom. Authorities recovered $1,768 in cash in the living room. In the bathroom by the hall closet, authorities found a scale of the type commonly used to weigh controlled substances.

Rea does not deny that he possessed the guns. Rather, he argues that it was "clearly improbable" that he possessed the guns in connection with the conspiracy or the CCE. Rea claims that no meth was found at the location, the meth was prepared for distribution at a different location, the money could have been proceeds from either his restaurant or tire shop business, and the scale could have been used for purposes other than to weigh meth. Rea's argument defies reason and flies in the face of ordinary sensibilities.

We conclude that the government carried its initial burden by proving by a preponderance of the evidence that Rea possessed the firearms and that there was a sufficient connection between the guns and his drug convictions. It takes no more than common sense to understand that such a connection existed. Although Rea attempts to propose alternative theories as to why the guns, cash, and scale were all present in his home, it is illuminating that he never actually attempted to explain why he possessed an AK-47, or the actual source of the cash, or the specific purpose for the scale. Certainly Rea cannot seriously argue that the AK-47 assault rifle found in the hall closet has any unrelated and innocent purpose. *See* Application Note 3 to § 2D1.1 (noting that "the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet"). Rea also concedes that he was a meth dealer and that he was involved in the drug conspiracy.

Because the government demonstrated that the guns were found in close proximity to drug paraphernalia

and that Rea dealt in large quantities of meth on a frequent basis, the burden properly shifted to Rea to prove that it was "clearly improbable" that he possessed the firearm in connection with the drug offense. Rea offered no evidence to establish that it was "clearly improbable" that he possessed the firearm in connection with the CCE offense. Therefore, we find that the district court did not plainly err by imposing the firearm sentencing enhancement.

### B. Jose Medina

Medina makes two arguments on appeal. He argues that the government presented insufficient evidence to convict him of conspiracy and that the district court committed plain error when it sentenced him by incorrectly calculating his criminal history score. We discuss each argument in turn.

#### 1. Sufficiency of the Evidence

At the close of evidence, Medina's counsel moved under Rule 29 for a judgment of acquittal and requested the district court to incorporate his final arguments as the basis for the motion. On appeal, Medina argues that the government failed to present sufficient evidence of his involvement in the conspiracy. Medina's theory is that he merely had a buyer-seller relationship with Rea.

When conducting a review of the sufficiency of the evidence, we view the evidence presented at trial and

draw all reasonable inferences from that evidence in the light most favorable to the government. *United States v. Gorman*, No. 09-3010, 2010 WL 2925447, at *3 (7th Cir. July 28, 2010). We will uphold the jury's verdict so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (internal quotation marks omitted). Because we owe great deference to the jury, *United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005), Medina's burden is "nearly insurmountable," *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010).

To prove a conspiracy to distribute methamphetamine under 21 U.S.C. § 846, the government was required to prove beyond a reasonable doubt that Medina knowingly and intentionally joined an agreement with at least one other person to commit an unlawful act—here, the distribution of methamphetamine. *United States v. Dean*, 574 F.3d 836, 842 (7th Cir. 2009).

There is a distinction, however, between a mere buyer-seller relationship and a defendant's participation in a conspiracy. *See United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc) (explaining the rationale for the "own-consumption" exception). In a buyer-seller relationship, "the sale of drugs, without more, does not constitute a conspiracy because the sale itself is a substantive crime." *Avila*, 557 F.3d at 815. But "[a]ll that is necessary to establish a drug distribution conspiracy is an understanding related to the subsequent distribution of narcotics." *Id*. at 816. In order to carry its burden, "[t]he government need only show an agreement that

goes beyond the *individual* sale between buyer and seller." *Id.*; *see also United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010) ("[T]he government must offer evidence establishing an agreement to distribute drugs that is *distinct* from evidence of the agreement to complete the underlying drug deals") (emphasis added).

We have noted that "[t]he agreement need not be formal, and the government may establish that agreement, as it may other elements of the charge, through circumstantial evidence." *United States v. Gilmer*, 534 F.3d 696, 701 (7th Cir. 2008) (*quoting United States v. Taylor*, 116 F.3d 269, 271 (7th Cir. 1997)). Accordingly, "a jury can infer an agreement from the parties' course of dealing." *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006). For example, we have held that a conspiracy exists when the defendant and a co-conspirator were on the "same side of the transaction." *Id.*

Other evidence the government may present to prove a conspiracy to distribute drugs includes "sales of large amounts of drugs, prolonged cooperation, a level of mutual trust between the parties, standardized dealings, and sales on a consignment or 'fronted' basis." *Avila*, 557 F.3d at 816. Because some of these factors individually may create an inference of either a buyer-seller relationship or a conspiracy to distribute drugs, we have clarified that the following examples weigh more heavily in favor of finding a conspiracy:

> sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the

other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities.

*Johnson*, 592 F.3d at 755-56 (footnote omitted).

We find Medina's insufficient evidence claim unpersuasive. Rea delivered two pounds of meth to Medina per week. Sarai Solano identified Medina as one of Rea's meth distributors, and she said that Medina visited Rea's restaurant twice per week from October 2005 until December 2005. Solano also testified that she routinely overheard conversations between Rea and Medina in which Rea agreed to front meth to Medina, and that Rea had reached out to Medina in order to gain access to Medina's clientele. Solano further testified that she and Nunez began transporting two pounds of Rea's methamphetamine per week to Medina at Medina's tire shop beginning in December 2005; she accompanied Rea and Nunez when they visited Medina's tire shop where they attempted to collect money for meth that Rea had fronted Medina; she overheard repeated arguments between Nunez and Medina about Medina's failure to pay Rea; she would often go with Nunez to the tire shop in an effort to collect money owed by Medina to Rea; and she understood that Rea took over Medina's tire shop because of the money Medina owed him for the fronted meth.

Medina argues that Solano's testimony only implies that a buyer-seller relationship existed. He contends that no testimony was presented that specifically

identified how much meth was fronted or the frequency of such transactions. We disagree.

The jury obviously chose to believe Solano, and "it is not for us to second guess" the jury's credibility determination on a challenge to the sufficiency of the evidence. *United States v. Smith*, 34 F.3d 514, 521 (7th Cir. 1994). Further, Medina conceded that Rea supplied large amounts of meth to him, and it is clear from the evidence that Rea gave Medina meth in a standardized amount and on a regular basis. Rea provided meth in significant quantities so that he could indirectly distribute to Medina's clientele. The government provided evidence that Medina worked with Rea for a prolonged period—from October 2005 to February 2007. Solano's testimony referring to overhearing multiple conversations regarding fronting demonstrated that there were a number of "fronting" occasions. This is supported by the ongoing debt issues between Medina and Rea and Rea's eventual takeover of Medina's tire shop. Based on this accumulated and mutually reinforcing evidence, we easily conclude that any reasonable juror could find that the relationship between Rea and Medina exceeded that of a buyer-seller relationship.

Because of this conclusion we need not address the evidence concerning Medina's other dealing relationships.

### 2. Sentencing

Medina also argues that the district court erred by including an additional four points in his criminal

history score when it calculated his guidelines sentence. Because Medina failed to object to the criminal history calculation before the district court, we review for plain error. *United States v. Jumah*, 599 F.3d 799, 811 (7th Cir. 2010). "Under plain-error review, the defendant must show that (1) there was error, (2) it was plain, (3) it affected his substantial rights and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Id.* (*citing United States v. Olano*, 507 U.S. 725, 732-35 (1993)).

The PSR set Medina's total offense level at 38 and his criminal history category at IV. Based on an advisory guidelines range of 324 to 405 months' imprisonment, the district court sentenced Medina to 350 months' imprisonment.

Medina's criminal history category calculation included a total of nine criminal history points, four of which Medina contests. The government concedes that two of the points were in error.[2] Medina's arguments regarding the other two challenged points are patently without merit, and we decline to use more ink addressing

---

[2] The government concedes that Medina should have received two instead of three criminal history points based upon the PSR's allegations that Medina committed conspiracy while serving a probationary sentence and less than two years after his release from custody. The government also concedes that Medina should have received two instead of three criminal history points for his identity theft conviction.

them here. Although we conclude that Medina should have been assessed a total of seven instead of nine criminal history points, he still falls within the same criminal history category used by the district court when it calculated his sentence. The calculation errors by the district court therefore could not have affected Medina's substantial rights.

### III. CONCLUSION

For the foregoing reasons, we VACATE Rea's conspiracy conviction and sentence, and we AFFIRM Rea's CCE conviction and sentence. We also AFFIRM Medina's conspiracy conviction and sentence.